**Patricia BRAGG, et al., Plaintiffs,**

v.

**Dana ROBERTSON, et al., Defendants.**

**No. Civ.A. 2:98–0636.**

United States District Court,
S.D. West Virginia,
Charleston Division.

March 3, 1999.

Joseph M. Lovett, Mountain State Justice, Charleston, WV, James M. Hecker, Trial Lawyers for Public Justice, Washington, DC, for Patricia Bragg, James W. Weekley, Sibby R. Weekley, plaintiffs.

Patrick C. McGinley, Morgantown, WV, James M. Hecker, Trial Lawyers for Public Justice, Washington, DC, Suzanne M. Weise, Morgantown, WV, for The West Virginia Highlands Conservancy, Harry M.

Hatfield, Carlos Gore, Linda Gore, Cheryl Price, Jerry Methena, Tommy Moore, Victoria Moore, plaintiffs.

Michael L. Keller, Assistant U.S. Attorney, Charleston, WV, Rebecca A. Betts, United States Attorney, Charleston, WV, Lois J. Schiffer, Asst. Atty. Gen., Steven E. Rusak, U.S. Department of Justice, Environment & Natural Resources Div., Environmental Defense Section, Washington, DC, Ruth Ann Storey, U.S. Department of Justice, Environment & Natural Resources Div., General Litigation Section, Washington, DC, for Dana Robertson, Joe N. Ballard, Michael D. Gheen, defendants.

Thomas L. Clarke, William E. Adams, Jr., Craig B. Giffin, West Virginia Division of Environmental Protection, Office of Legal Services, Charleston, WV, Russell M. Hunter, West Virginia Division of Environmental Protection, Office of Mining & Reclamation, Nitro, WV, Benjamin L. Bailey, Brian A. Glasser, Bailey & Glasser LLP, Charleston, WV, for Michael Miano, Director, West Virginia Division of Environmental Protection, defendant.

Roger A. Wolfe, Robert G. McLusky, James R. Snyder, Jackson & Kelly, Charleston, WV, for Hobet Mining, Inc., Catenary Coal Co., Mingo–Logan Coal Co., intervenors-defendants.

W. Warren Upton, M. Shane Harvey, Terry R. Sammons, Jackson & Kelly, Charleston, WV, for The West Virginia Mining and Reclamation Association, West Virginai Coal Ass'n, intervenors-defendants.

W. Henry Lawrence, IV, Robert D. Pollitt, Richard L. Lewis, Richard N. Farmer, Steptoe & Johnson, Charleston, WV, for Western Pocahontas Properties Limited Partnership,National Council of Coal, intervenors-defendants.

Grant Crandall, James M. Haviland, George P. Surmaitis, Crandall, Pyles, Haviland & Turner, Charleston, WV, for International Union, United Mine Workers of America, intervenor-defendant.

## MEMORANDUM OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

HADEN, Chief Judge.

Pending is Plaintiffs' motion for a preliminary injunction. At a continuing hearing held on February 4 and 5; February 9 and 10; February 17, 18 and 19; and February 26, came the Plaintiffs by counsel Joseph Lovett, James Hecker, Suzanne Weise and Patrick McGinley; the federal Defendants[1] by Department of Justice counsel Steven Rusak and Ruth Ann Storey; Defendant Miano[2] by counsel Russell Hunter, Craig Giffin and Thomas Clarke; the Arch subsidiaries (Hobet) by counsel Roger Wolfe, James Snyder and Robert McLusky; the Associations[3] by counsel Warren Upton and Shane Harvey; and the Land Companies[4] by counsel Robert Pollitt and Rick Farmer for a hearing on Plaintiffs' motion. After considering the arguments of counsel, the Court **GRANTS** the motion.

### I. BACKGROUND

This case involves the proposed issuance of permits by state and federal agencies required before a mining company may conduct surface mining operations colloquially known as "mountaintop removal mines." Because several permits are required from different agencies and under complex laws and regulations, the Court briefly outlines the permitting process.

Under the Surface Mining Control and Reclamation Act ("SMCRA"), "[s]urface mining operations must comply with the environmental protection performance standards established by SMCRA and refined in its implementing regulations." 5 Am.L. of Mining § 172.05[1]. The permit applicant must receive a SMCRA permit from the regulatory authority which, in this state, is the DEP.

A mining company must also seek permits in order to comply with the Clean Water Act. Our Court of Appeals has recognized that "[t]he stated objective of the Clean Water Act is 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *James City County, Va. v. EPA,* 12 F.3d 1330, 1332 (4th Cir.1993), *cert. denied,* 513 U.S. 823, 115 S.Ct. 87, 130 L.Ed.2d 39 (1994) (citing 33 U.S.C. § 1251(a)). Under Section 401 of the Clean Water Act ("CWA"), the permit applicant must "obtain a certification from the state in which the proposed discharge is located that the discharge will comply with any applicable water quality standards." 5 Am.L. of Mining § 169.02[2][a][i]. Section 402 "makes it unlawful to discharge any pollutant from a point source [within the mine operation] to waters of the United States without an NPDES[5] permit." *Id.* (footnote added)

Under Section 404, the applicant must receive a permit from the United States Army Corps of Engineers ("Corps") "for the discharge of dredged or fill material into the navigable waters," 33 U.S.C. § 1344(a), which are all "waters of the United States." *Id.* § 1362(7). An applicant may seek a general Section 404 permit under the Nationwide Permit ("NWP") program, if the mining "will cause only minimal adverse effects when performed

---

1. Defendants Dana Robertson, Joe Ballard, and Michael Gheen, officials of the United States Army Corps of Engineers, will be referred to, collectively, as "federal Defendants."

2. Defendant Michael Miano is the Director of the West Virginia Department of Environmental Protection ("DEP").

3. West Virginia Coal Association and West Virginia Mining and Reclamation Association will be referred to, collectively, as "the Associations."

4. Western Pocahontas Properties Limited Partnership and National Council of Coal Lessors, Inc. will be referred to, collectively, as "Land Companies."

5. National Pollutant Discharge Elimination System.

separately, and will have only minimal cumulative adverse effect on the environment." 5 Am.L. of Mining § 169.02[3][b][iii][A]. For surface coal mining, the relevant Nationwide Permit is generally NWP 21. Alternatively, if the mining will not qualify under the Nationwide Permit program, the applicant may seek an individual section 404 permit.[6]

## A. Procedural Background

Because several agencies are called upon to permit mountaintop removal mining under more than one federal and state statute and regulation, the procedural background is challenging.

Plaintiffs instituted this civil action on July 16, 1998, alleging three counts against the federal Defendants and ten counts against Defendant Miano, of the DEP.

In *Counts* One through Ten, Plaintiffs sued Miano, alleging a pattern and practice of violations of mandatory non-discretionary duties under SMCRA and the West Virginia state regulatory program approved under that statute.

In *Counts* Eleven though Thirteen, Plaintiffs sued the federal Defendants, alleging a pattern and practice of failure on their part to carry out their statutory duties under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.,* Clean Water Act, 33 U.S.C. §§ 1344 *et seq.,* and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553, 706(2)(A). Plaintiffs allege it is unlawful for the Corps to issue NWPs for surface mining valley fills in West Virginia; the Corps violates NEPA by issuing NWPs without the required analysis; and the Corps issues permits in a manner that allows illegal segmentation of intended mine operations.

One of the proposed permits alleged to be an instance of the pattern and practice is Hobet's Spruce Fork # 1 mine, a permit application submitted by the Arch subsidiaries. Two of the individual Plaintiffs, James and Sibby Weekley, live in Pigeonroost Hollow, directly adjacent to the proposed mine, where valley fills for the mine would be placed. If the permits are granted, it is undisputed this mine would be the largest contiguous surface mine permit in state history.

Arguments about the Spruce Fork mine were first brought before the Court in November 1998 when Plaintiffs sought a temporary restraining order ("TRO") to force Defendant Miano to rescind the surface mining permit granted November 4, 1998.[7] The issue was averted because Hobet had to acquire other permits before mining or disturbance could begin and because, at the hearing, Hobet offered a conciliation. It agreed to give Plaintiffs at least one week's notice before beginning any mining activity at Spruce Fork. Because Plaintiffs could not demonstrate irreparable harm, in light of the concession, the Court denied the motion for a TRO.

On December 7, Plaintiffs moved for summary judgment, declaratory judgment and a permanent injunction or, in the alternative, for a preliminary injunction on *Count* 12, a count alleged against the federal Defendants. One day later, Plaintiffs and the federal Defendants moved to cancel the preliminary injunction hearing and to withdraw the motion for a preliminary injunction. The Court granted the respite. Plaintiffs' motion for summary judgment, declaratory judgment and permanent injunction remained pending.

On December 23, 1998, based on a proposed Settlement Agreement,[8] Plaintiffs moved for voluntary dismissal of the three

---

**6.** For a more detailed discussion of the NWP program, *see infra* section II.C.2.b.

**7.** Plaintiffs argued Miano had agreed to give them two days' notice before issuing the permit, but failed to give such notice. In turn, Miano argued the agreement had been condi-

tioned on Plaintiffs' refraining from filing suit, which was breached in July 1998.

**8.** The Settlement Agreement was signed by counsel for Plaintiffs, the federal Defendants and Miano.

counts against the federal Defendants. The Settlement Agreement stated the Corps, in conjunction with other federal and state agencies, would

> enter into an agreement to prepare an Environmental Impact Statement ("EIS") on a proposal to consider developing agency policies, guidance, and coordinated agency decision-making processes to minimize, to the maximum extent practicable, the adverse environmental effects to waters of the United States and to fish and wildlife resources affected by mountaintop mining operations, and to environmental resources that could be affected by the size and location of excess spoil disposal sites in valley fills.

Page 3. In the interim, the agreement will require mining companies to seek individual Section 404 permits, rather than NWPs, when there are more than minimal adverse effects expected. The Agreement stipulates that if a mining permit will drain a watershed of 250 acres or more, it will be "considered" to have more than minimal adverse effects. *See* pages 4–5.

Important for this injunction application, Plaintiffs specifically reserved in the Settlement Agreement the right to challenge the proposed Spruce Fork permit, which was exempted from application of the new policies.

On December 30, 1998 the Court granted Plaintiffs' motion to amend their Complaint, which, *inter alia,* added two new claims against Defendant Miano, alleging similar violations of nondiscretionary duties in the same course of conduct. On January 6, 1999 Plaintiffs moved again for leave to file a Second Amended Complaint, which deleted the previously-alleged counts against the federal Defendants and a similar count against Defendant Miano, but which added two new counts against Defendant Robertson.[9]

Plaintiffs moved for a TRO on January 22. Due to an unopposed motion to continue the hearing, the parties did not argue the motion until February 3, at which time the Court granted the TRO, pending the injunction request. The preliminary injunction hearing began the next morning and has continued on every day available on the docket, eventually consuming over thirty-five hours of courtroom time. The subjects of evidence and argument are complex, and the interplay of statutes and regulations is byzantine. The Court emphasizes that a decision on the merits of the case will not be made until discovery and other pretrial processes are complete.

### B. Factual Development

Plaintiffs argue that, without preliminary injunctive relief, mining at Spruce Fork will bury a living stream and a forested hollow, permanently destroying the indigenous wildlife and flora as well as the unique topography of this portion of southern West Virginia. They allege Miano has granted permits in violation of his nondiscretionary duties requiring that the mined area meets approximate original contour ("AOC") requirements, in granting a buffer zone variance, in granting a contemporaneous reclamation variance, and in not requiring a hydrologic reclamation plan. Plaintiffs allege the federal Defendants violated a nondiscretionary duty by granting a permit under the NWP 21 program and by failing to conduct an Environmental Assessment ("EA") or to require an Environmental Impact Statement ("EIS") before issuing the permit.

Miano and the federal Defendants contend they have completed all duties required under the law. Hobet joins in their

---

**9.** On January 7, the Court conferred with counsel to discuss the meaning and ramifications of the Settlement Agreement. The Court ordered the parties to brief the issues, and that briefing is now complete. The parties requested and the Court agreed that Plaintiffs' motion to amend their complaint and Plaintiffs' motion for summary judgment and a permanent injunction would be held in abeyance until matters regarding the Settlement Agreement were resolved.

arguments. Specifically, Miano argues the permit application indicates the mine will be restored to AOC. He also argues DEP made the required findings before granting the buffer zone and contemporaneous reclamation variances, and that all elements of the hydrological reclamation plan are included within the permit application. Similarly, the federal Defendants argue the Corps properly determined the mine qualified for NWP analysis because it would have minimal adverse impacts. The Corps argues it has already conducted an EA on NWP 21 and found such permits have no significant impact, a finding that satisfies NEPA review. Generally, all Defendants argue that, because Defendants have made all required findings and conclusions, Plaintiffs are actually contesting Defendants' exercise of discretion in making required findings and conclusions.

## II. DISCUSSION

### A. Jurisdiction

■ Although the parties have not contested the issue seriously, the Court is ever mindful to examine subject matter jurisdiction. After an evaluation of statutory and congressional intent, the Court previously held Plaintiffs need not exhaust administrative remedies before filing a citizen action alleging agencies have engaged in a pattern and practice of violations of mandatory, nondiscretionary duties. *Bragg v. Robertson*, 2:98–0636, slip op. at 9–16 (S.D.W.Va. Oct. 9, 1998) (Haden, C.J.). "Because Congress has not specifically mandated exhaustion of administrative remedies for citizen suits, the question lies within the sound discretion of the Court." *Id.* at 13. The Court holds that when a plaintiff states allegations of a pattern and practice claim sufficient to survive a motion to dismiss, there is no exhaustion requirement before attacking a particular permit as an instance of the alleged pattern and practice violations.

### B. Standard of Review

#### 1. Preliminary Injunction Standard

■ Our Court of Appeals has a long tradition of applying a balancing test in determining whether a preliminary injunction is properly granted. *See Blackwelder Furn. Co. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189 (4th Cir.1977). The sequential application of the *Blackwelder* factors was discussed most recently in *Steakhouse, Inc. v. City of Raleigh, North Carolina*, 166 F.3d 634, 636 (4th Cir.1999):

> In deciding whether to grant a preliminary injunction, the district court is to consider three factors. First, it must balance the likelihood of irreparable harm to the plaintiff if the injunction is refused against the likelihood of irreparable harm to the defendant if it is granted. Second, the court should consider the likelihood that the plaintiff will succeed on the merits. The more the balance of harms leans away from the plaintiff, the stronger his showing on the merits must be. Finally, the court must consider the public interest. *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir.1977).

*Id.* The plaintiff bears the burden of proving the factors favor the grant of an injunction. *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir.1997).

■ On review, the Court of Appeals applies an abuse of discretion standard, *Steakhouse*, 166 F.3d at 639 (citing *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 814 (4th Cir.1991)).

In applying the balancing test, the most important factors are the two factors regarding the balancing of harms. *Manning*, 119 F.3d at 263. A plaintiff must demonstrate harm that is " 'neither remote nor speculative, but actual and imminent.' " *Id.* (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2nd Cir.1989)). If, after balancing the harm to a plaintiff if the injunction is not granted against the harm to a defendant if the injunction is granted,

"the balance 'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.' As the balance tips away from the plaintiff, a stronger showing on the merits is required."

*Id.* (citations omitted). Until the balancing of harms is complete, " 'the district judge cannot know how strong and substantial must be the plaintiff's showing of 'likelihood of success.' " *Id.* (quoting *Direx Israel,* 952 F.2d at 812).

The Court recognizes " '[T]he grant of interim relief [is] an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in limited circumstances which clearly demand it.' " *Steakhouse,* 166 F.3d at 639 (quoting *Direx Israel,* 952 F.2d at 811 (internal quotation marks omitted)).

### 2. Arbitrary and Capricious Standard

■ Fourth Circuit precedent establishes the application of the arbitrary and capricious standard in reviewing the merits of agency actions. *James City County v. EPA,* 12 F.3d 1330, 1338 n. 4 (4th Cir. 1993), *cert. denied,* 513 U.S. 823, 115 S.Ct. 87, 130 L.Ed.2d 39 (1994). That standard is circumscribed by example and limitation:

When reviewing an agency's decision to determine if that decision was arbitrary and capricious, the scope of our review is narrow. Like the district court, we look only to see if there has been a "clear error of judgment." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). An agency's rule would be *arbitrary and capricious if the agency relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the* *evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Although our inquiry into the facts is to be searching and careful, this court is not empowered to substitute its judgment for that of the agency. *See Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

*Hughes River Watershed Conservancy v. Johnson,* 165 F.3d 283, 287–88 (4th Cir. 1999) (emphasis added).

### C. Application of the Standard

#### 1. Balancing of the Harms

##### a. Harm to Plaintiffs in Absence of Injunction

The harm to Plaintiffs in the absence of preliminary injunctive relief is actual, imminent and wholly irreparable. Not only would mining activity detrimentally affect James and Sibby Weekley, who live within the hollow where valley filling will occur, the valley fill would actually and detrimentally affect the stream and its flora and fauna near the Weekleys' home.

James Weekley, who has lived in Pigeonroost Hollow for 57 years, and in his current home for a decade, fished and swam in the stream his entire life; his grandchildren now do the same. Weekley obtains water from the stream year-round. He and his wife Sibby enjoy watching the variety of animals that live in the stream and in the surrounding area. Mr. Weekley described the Hollow: "To me it's a rain forest. It's a beautiful place with clear water, with every aquarium life in it, all different species of hardwoods, between two mountains that is very, very beautiful to me." Feb. 4 & 5 Tr. at 11.

The blasting at the Dal–Tex Mine, another Arch operation located about ¾ miles by air or 2½ miles by road from the Weekleys' home, has cracked the walls of their

house. The Dal–Tex operations have made the air so dusty that he and his wife cannot sit out on the porch comfortably. Even while staying inside, the Weekleys cough from dust particles and their furniture is constantly layered with dust.

Cindy Rank, Chair of the West Virginia Highland Conservancy's ("Highland Conservancy," "Conservancy") Mining Committee, testified to the harm that will occur to the Highland Conservancy members if the injunction does not issue. She characterized the group as "protect[ing] special places" and "the specialness of the place that we find in West Virginia, the clean water, the clean air that allows us to have healthy communities of people and wildlife." Feb. 4 & 5 Tr. at 71.

Last fall, the Conservancy organized a rally in which it conducted a flyover of the proposed Spruce Fork mine and visited Pigeonroost Hollow. Mr. Weekley showed them where the mine would be located, according to the maps he had seen. Members hiked up the hollow to the ridgeline and looked at the proposed Spruce Fork site, as well as the current Dal–Tex mine. Rank remembered, "My heart sunk and I think everyone else's did. It was a relatively cheery walk—hike up the hill. Got very quiet and people were visibly shaken from what they thought would appear behind us when they looked across and saw what was already taking place." Feb. 4 & 5 Tr. at 76–77. On another trip to a mine, Conservancy members walked to the bottom of a fill and were "aghast." *Id.* at 81. Rank testified the group intends to continue outings to view the natural habitat in areas like Pigeonroost Hollow "to the greatest extent their physical and mental

abilities can stand." *Id.* at 112. Rank has visited several mine areas, including several mountaintop removal sites, over the past few years.

Rank was "pretty much upset" at seeing the loss of "some of the richest areas of West Virginia." *Id.* at 80. She considered Pigeonroost Hollow to be "much like a whole lot of hollows I have been to and the one I live in," that is, "pristine," although there is a deserted car in the hollow where she lives. *Id.* at 76. Rank explained, "I think the quality of the ecosystem and the water and all are pristine, and I certainly think Pigeonroost was one of those basically undisturbed hollows that we find all over the State of West Virginia." *Id.*

Other Conservancy members have encountered the effects of mining. One was kayaking elsewhere in southern West Virginia and could not travel up one of his favorite tributaries because it no longer existed, having been covered and destroyed by mining activities. *Id.* at 111.

Plaintiffs introduced a map prepared by Rank showing the extent of surface mining in Boone, Mingo and Logan counties of southern West Virginia. Rank transposed topographical maps of issued and pending [10] mine permits prepared by a geologist in the Logan DEP office onto a larger topographical map.[11] While preparing it, she observed a noticeable change in the size of the permits. Permits issued in the late 1980s and early 1990s were approved for noticeably larger contiguous areas than were earlier ones. Although Rank's map does not purport to depict what areas have been reclaimed within the map area, it demonstrates the surface area that has

10. Rank believes one permit depicted on the map, Independence Constitution mine permit, is still pending. She indicated that others may be pending still but has been unable to verify that information.

11. Rank admits she has no training or experience in map-making, and that she made no effort to ground-truth the boundaries of the permits. She stated that she resorted to this method only after attempting in vain to dis-

cover such a composite map that might have been kept by the state regulators. She next attempted in vain to develop the map by her own independent research but, because of the nature of the permit files and the sheer volume of permit applications, determined the best way to proceed was utilizing these individual topographical maps from the Logan DEP office.

been or is proposed to be disturbed by mining within three counties.

Plaintiffs' biologist, Benjamin Stout III, testified the stream was "a very nice pristine watershed" with very little human or natural disturbance.[12] Feb. 9 & 10 Tr. at 35. Considering that, he characterized the stream as within the top ten percent of streams, as "exceptionally good water quality." *Id.* at 40. The area of the stream is over ninety percent forested. *Id.* at 35. He classified the stream as a perennial stream, of third order at its mouth.

Stout determined the stream is a "keystone community"[13] such that its destruction would have serious detrimental effects on downstream communities. He based his judgment primarily on the strength of macroinvertebrates, which are the primary consumers in the stream. Stout found "diverse, abundant, and vibrant macroinvertebrate communities in all the streams" he examined at Pigeonroost Hollow. *Id.* at 40. At the mouth of the stream, Stout found all three cycles of stonefly pteronarcys, a very pollution-sensitive species with a three-year life cycle, indicating that, over the last three years, nothing has disturbed the stream in a way to disturb its lifecycle. This further supports classification of the stream as perennial because it demonstrates there was sufficient water year-round for this species to continue to live. It also supports the stream's classification as very good quality because the animal is pollution-sensitive.

Because the headwater stream community is a "keystone community," if it is disturbed, the rest of the stream is ad-

versely affected in a serious manner. *Id.* at 47. Stout described the ecosystem of the watershed and forest community as completely interrelated and interdependent. The forest canopy buffers the daily fluctuations in temperature, keeping the stream-temperature at a moderate level, which protects aquatic life. Fallen limbs in the streambed hold fallen leaves long enough for the macroinvertebrates to shred them into fine particles that feed larger animals downstream. Deforestation would eliminate this interdependence and destroy the aquatic life.

Similarly, if the watershed is destroyed, diversity within the forest community will fail. The watershed is a critical area for growth of insects, which, at adulthood, leave the stream and are the primary food-source for mammals and birds of the forest community. The insects are not only the primary foodsource, but also a unique one because they are composed mostly of fats, unusual in the forest, and of protein.

Furthermore, Stout testified that a study performed by a private environmental group for Hobet that discussed the effects of valley fills would never withstand peer review. Stout explained the report failed to include a scientific control group so it was impossible to see what changes might have occurred simply based on natural changes, such as *El Nino*. Second, the measurements were taken at inconsistent times of the year, first April, then May and finally July. Stout explained that samples taken in April or May would contain different organisms than would be present in the stream in July, a difference that would in itself make the samples inconsis-

12. The Court notes that both Stout and Rank described the stream at Pigeonroost as "pristine." The Court has personally viewed the stream and surrounding area, including the presence of a refrigerator and a table, and concludes the "pristine" label is over-reaching. Similarly, the Court discounts James Weekley's testimony regarding the size and presence of trout and other fish varieties in the stream. Nonetheless, during the site visit, the Court found the stream to be of very good quality, with clear running water, and

containing many of the beneficial aquatic life about which Stout testified.

13. Stout testified that the article first supporting the keystone community theory is the most widely-cited article in the aquatic biology area. Under this theory, the headwaters are a "keystone" because if the keystone is taken out, the rest of the arch falls. Feb. 9 & 10 Tr. at 47.

tent. The Hobet study also used different sampling techniques: first using a square foot sampler but then using handpicking techniques. Finally, it took too few measurements to give an accurate view of what was occurring in the sampled areas. They sampled once, then seven years later, and then four years later. Three samples over an eleven year period made it "pretty tough to ascertain what's going on out there." *Id.* at 56.

### b. Harm if an Injunction Issues

Hobet presented evidence demonstrating significant harms to the company, workers and the local economy if the permit is further delayed. First, Mark White, general manager of the division of Hobet that contains the proposed Spruce Fork operation and the current Dal–Tex mine, testified that the company has suffered losses of a million dollars a month since July 1998 at just the Old Hickory mine at Dal–Tex. Because the company is unable to begin pre-mining operations at Spruce Fork, it has had to begin "marginal" mining of less profitable seams at Old Hickory. Because there were losses rather than profits in these areas, the company has shown losses in other areas. The company has had to buy coal outside its own operations to make up for shortfalls in expected production.

Even the marginal areas, however, will provide mining activity utilizing miners and equipment until mid-summer for some operations and December 1999 for others. Hobet expects that, if a permit is issued immediately, the dragline will be idle for one to three months. Currently Hobet has laid off thirteen employees and issued WARN notices [14] for others. With the shutting down of the marginal operations, it anticipates continued layoffs.

White also testified that, because of the massive investment in the Spruce Fork operation, which currently carries a book value of $70 million, the company may not continue to suffer losses, but instead may choose to close the complex. If it did that, he warned the complex's 300 employees would lose their jobs. Similarly, equipment would be moved to operating locations outside of West Virginia.

He averred that mining using mountaintop removal methods was the only economically feasible option for the site because of the depth and placement of the coal seams. Nevertheless, he also acknowledged that Spruce Fork could be mined with shovel and truck operations but at a much greater cost.

Hobet also presented expert testimony of Michael Brookshire that total economic losses from the withholding of the permit until September 1999, the approximate time of trial, is over twenty million dollars. This number included lost compensation to production and supervisory employees, lost compensation to contractors for services, lost income to vendors, and lost income to mineral rights owners. Projected lost tax revenue to West Virginia was calculated at over one and a half million dollars during the delay period.

Finally, Hobet presented evidence to rebut Plaintiffs' demonstration of harm. Mark White testified that the only disturbance near the Weekleys' home in the next several months would be the construction of the sediment pond four thousand feet upstream from their home.[15] Hobet elicited testimony from DEP witnesses that, once the catchment pond were filled after an initial storm, there would be no change in the downstream flow. Its consulting biologist, Jessica Yeager, testified she found evidence the stream had been disturbed by logging and human activities, by damming, draining and littering. Because

---

14. WARN notices give affected employees notice of a potential and impending layoff under the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. §§ 2101–09.

15. White acknowledged that the proposed valley fill above the Weekleys' home would commence five or six months after the issuance of the permit, which would be prior to the September trial date.

of this, she opined the stream has shifted from a keystone community to a damaged one that produces little energy flowing downstream. Similarly, a wildlife ecologist, Dr. Edwin Michael, testified that the Pigeonroost Hollow habitat rated as a 59 at stream-side and a 69 at ridge-top, on a scale of 0 to 100. By contrast, two reclaimed mining areas rated as 80. He testified to one area of recent logging and other signs of logging within the past twenty-five years.

### c. On Balance

■ Weighing the harms to be suffered by Plaintiffs in the absence of an injunction against the harms to be suffered by Defendants and Hobet if an injunction is issued, the Court finds the balance "tips decidedly" in favor of Plaintiffs.

First, although the federal laws at issue consider economic interests, the laws are intended to protect environmental interests. In its findings for SMCRA, Congress acknowledged the importance of the coal industry to the Nation's energy needs but also recognized the vast impact on the environment, private property and quality of life that surface mining had made in some areas. 30 U.S.C. § 1201(b)–(d). Accordingly, Congress stated that the purpose of SMCRA was to:

(a) establish a nationwide program *to protect society and the environment from the adverse effects of surface coal mining operations;*

. . .

(d) assure that surface coal mining operations are so conducted as *to protect the environment;*

. . .

(f) assure that coal supply essential to the Nation's energy requirements, and to its economic and social well-being is provided and *strike a balance between protection of the environment and agri-*

*cultural productivity and the Nation's need for coal as an essential source of energy.*

*Id.* § 1202. Congress recognized the need to ensure the balance is maintained among protecting the environment, protecting the citizenry and protecting the coal industry. Nonetheless, written against a backdrop of prior mining with little environmental regulation, it is clear the laws' primary protections extend to the citizenry and the environment.

Here, the Court cannot ignore the economic harm that Hobet will suffer if an injunction issues. Hobet has made a significant investment in the Spruce Fork mine, considering the cost of the operation itself, the cost of purchasing homes around the proposed mine, and preparing the permit applications. Moreover, the dragline alone is a significant investment and, if idled, downtime will be costly. Finally, Hobet adduced evidence of current and proposed layoffs, caused by the delay in mining operations at Spruce Fork. These harms, however great, are purely temporary economic harms.

On the contrary, the harms to Plaintiffs are imminent and irreversible. Although the stream quality is not as "pristine" as some have testified, the harms currently present in the Pigeonroost stream in the form of foreign objects such as a refrigerator and a table, are easily removable and, thus, reparable. This differs dramatically from the permanent destruction of the stream by filling it with tons of rock and fill. Furthermore, Stout located, without Yeager's protest, many of the beneficial aquatic animals to which Stout earlier testified and only some of the predator animals to which Yeager testified.[16] Overall, the Court's site visit, examination of the stream and surrounding area, and observation of wildlife indicate the stream is a

16. The Court is concerned, not with harm to the individual species of aquatic animals themselves, but instead with the consequential and serious detrimental effects caused by

destroying a link in the stream and forest community, harming the community itself and the Weekleys, that would occur within the time period before the September trial.

keystone community rather than the damaged community of Yeager's portrayal.

The Court's helicopter flyover of all mountaintop removal sites in southern West Virginia revealed the extent and permanence of environmental degradation this type of mining produces. On February 26, the ground was covered with light snow, and mined sites were visible from miles away. The sites stood out among the natural wooded ridges as huge white plateaus, and the valley fills appeared as massive, artificially landscaped stair steps. Some mine sites were twenty years old, yet tree growth was stunted or non-existent. Compared to the thick hardwoods of surrounding undisturbed hills, the mine sites appeared stark and barren and enormously different from the original topography.

If the forest canopy of Pigeonroost Hollow is leveled, exposing the stream to extreme temperatures, and aquatic life is destroyed, these harms cannot be undone. If the forest wildlife are driven away by the blasting, the noise, and the lack of safe nesting and eating areas, they cannot be coaxed back. If the mountaintop is removed, even Hobet's engineers will affirm that it cannot be reclaimed to its exact original contour. Destruction of the unique topography of southern West Virginia, and of Pigeonroost Hollow in particular, cannot be regarded as anything but permanent and irreversible. Such harms cannot be remedied through the availability of damages. Again, the balance of harms "tips decidedly" in favor of Plaintiffs.[17]

### 2. Likelihood of Success on the Merits

█ Plaintiffs have presented evidence and argument on several complex grounds in which they allege Defendants have violated their mandatory, nondiscretionary duties. Of all these, the Court discusses only two of the serious legal issues which have been raised in some detail.

### a. Approximate Original Contour

Congress set out an approximate original contour ("AOC") requirement that applies "to all surface coal mining and reclamation operations" that require the operator to

> backfill, compact ... and grade in order to *restore the approximate original contour of the land with all highwalls, spoil piles and depressions eliminated* [.]

30 U.S.C. § 1265(b)(3) (emphasis added). The statute permits an exception to the AOC requirement if the applicant complies with statutory requirements for either a mountaintop removal variance or a steep slope variance. *See id.* § 1265(c), (e). The statute defines AOC as:

> that surface configuration achieved by backfilling and grading of the mined area so that the reclaimed area, including any terracing or access roads, *closely resembles the general surface configuration of the land prior to mining and blends into and complements the drainage pattern of the surrounding terrain,* with all highwalls and spoil piles eliminated; water impoundments may be permitted where the regulatory authority determines that they are in compliance with section 1265(b)(8) of this title.

*Id.* § 1291(2) (emphasis added); *see also* W.Va.Code § 22–3–3(e).

Neither Defendants nor Hobet attempt to argue that Spruce Fork was granted a variance or that it was qualified for one. Moreover, neither Defendants nor Hobet challenge that, in the absence of a variance, a surface mine must comply with AOC. In fact, Defendant Miano's brief states, "Without any doubt, the WVDEP, as the agency with primary responsibility for interpretation and enforcement of the SMCRA in West Virginia, has a mandato-

---

**17.** The Weekleys have demonstrated standing to proceed, which is sufficient for the Court to address the relief sought. The Court reserves the question of others' standing to pursue this relief.

ry duty to require restoration of AOC on surface mining operations for which no variance from this requirement is sought." Miano Reply Br. at 5. Instead, Defendants and Hobet argue that Defendants have made all findings necessary to determine, and have determined in fact, the mine will comply with the AOC requirement.

Relevant to the AOC issue, DEP Permit Supervisor, Larry Alt, explained how he educates new permit reviewers about determining AOC. Besides using chalkboard drawings, Alt draws contour lines around his knuckles. He then shows a closed fist as the original mountain and a semi-open fist as the restored mine site. Although his lessons include contour lines which, among other things, show elevation, Alt does not consider elevation in determining whether a permit meets AOC. Instead, Alt considers whether the site will have the same general contours as before and whether the site will be stable. Feb. 4 & 5 Tr. at 133–34.

Miano's primary defense is that the Court is without jurisdiction in this area because determining "*approximate* original contour" is by its nature a discretionary judgment call. Similarly, Hobet argues AOC and its definition use non-specific terms that give DEP discretion in its determination.

The AOC requirement and definition undeniably allow the use of some discretion in determining whether a permit meets the standard.[18] The agency must make a case-by-case determination of whether the requirement is satisfied. This does not, however, give the agency *carte blanche* in

making the determination. "*Approximate* original contour" does have an inherent meaning, more fully embodied in the definition requiring the post-mining site to "*closely resemble* [ ] the *general* configuration" of the land prior to mining. 30 U.S.C. § 1291(2). As Miano admits, DEP is under a nondiscretionary obligation to require the operator to restore the land to AOC if a variance is not requested and approved.

During the permitting process, the applicant is required to identify the pre-mining and post-mining topography to allow the DEP to make a determination of whether the operation will comply with the AOC requirement. Hobet's expert witness Oren Kitts measured one area on the pre-mining topography map as having a total elevation of 1,820 feet and an elevation change of 580 feet over 1250 feet. Feb. 19 Tr. at 30. The valley fill will raise the valley floor in some areas by as much as three hundred feet. Weekley, Feb. 4 & 5 Tr. at 17; Halstead, Feb. 9 & 10 Tr. at 151. The mountains will, in places, be lowered by as much as two hundred feet. Feb. 9 & 10 Tr. at 152. Current plans for regrading will leave five level or gently rolling areas, in stark contrast to the current topography. The post-mining elevation map showed one flat or approximately level area, 6000 feet in length, that had projected final elevations of less than 50 feet.

Furthermore, the revised permit application requires the elimination or diminution of some valley fills. Plaintiffs' expert John Morgan testified, and Hobet's expert

---

18. Hobet argues the AOC definition gives DEP discretion such that this Court may not review the DEP decision, citing *National Wildlife Federation v. Burford*, 677 F.Supp. 1445, 1468–69 (D.Mont.1985). The *Burford* plaintiffs challenged the Secretary of the Interior's decisions regarding the sale of coal leases. Relevant to this case, 30 U.S.C. § 1272(a)(5) required that "determinations of the unsuitability of land for surface coal mining ... shall be integrated *as closely as possible* with present and future land use planning ...." (emphasis added). The court held the

language "introduces a *limited* element of discretion allowing the Secretary *some* degree of latitude ...." 677 F.Supp. at 1469 (emphasis added). Contrary to Hobet's claim, however, the Court did not dismiss the complaint based on this "limited element of discretion." Instead, it found the plaintiffs were collaterally attacking regulations outside the public comment and notice period. Here, Plaintiffs are not challenging the efficacy of the "approximate original contour" statutory or regulatory requirement, but rather the manner in which Defendant Miano has applied it.

Oren Kitts concurred, the revision does not include excess spoil calculations demonstrating where all excess spoil will be placed.[19] The revision does not include a revised regrade map showing the post-mining regrade and topography either.[20] Instead, the revised proposal includes only two cross-sections, which show the surface configuration for just a slice of the mountain. Accordingly, it is difficult to determine exactly what the post-mining surface configuration will be, including the total relief, that is, the ratio of the highest elevation to the lowest valley and whether the post-mining shapes will "closely resemble the general surface configuration" pre-mining. This lack of information prevents a determination of whether the proposed post-mining configuration will meet AOC.

Finally, Plaintiffs introduced evidence of DEP's fifty-foot rule in determining AOC. Under this rule, if there is any change in elevation of more than 50 feet between pre-mining and post-mining elevations, the permit would not be considered to restore the area to AOC. Feb. 4 & 5 Tr. at 128–29. Larry Alt testified he did not apply the fifty-foot rule because he believed the rule had been withdrawn. In fact, Larry Alt sought and found the memorandum he had believed withdrew the rule, but discovered the memorandum did not withdraw the rule. *Id.* at 129–30. Lewis Halstead, DEP Assistant Chief of the Office of Mining and Reclamation, who is charged with permitting, testified that a prior DEP Director David Callaghan put out a "book" that rescinded all previous policies, including the fifty-foot rule, not specifically included in the book, Feb. 9 & 10 Tr. at 149–50, but neither DEP nor any other party has produced the document.[21]

Chief Halstead testified that DEP does not follow its fifty-foot rule but instead applies a completely subjective analysis in which changes in elevation play "a very minor role." Feb. 18 Tr. at 127. Without looking at pre-mining configuration, Halstead said that he could say a mine has been restored to AOC simply because, if a person did not know the mountain had been mined, they could not tell. *Id.* at 127–28. This, he said, was sufficient to qualify it as having been restored to AOC.

19. In mountaintop removal mining, the rock and dirt covering the coal, that is, the overburden, are removed to expose the coal seam. Once the material is removed, its volume "swells," that is, the material takes up a larger space because it is no longer compacted to a solid form. An excess spoil calculation enables one to determine that the amount of overburden removed from the mine site, including a swell factor, is equal to the sum of the amount of overburden needed to reclaim the disturbed area plus the amount to be deposited in valley fills.

Both Morgan and Kitts testified that the absence of excess spoil calculations precludes one from determining that the spoil "balances," that is, that the amounts are equal, within a reasonable degree of accuracy. Both experts testified that the information within the recent proposed revision demonstrates the spoil is out of balance by what may be a significant amount. Morgan, Feb. 4 & 5 Tr. at 187–89; Kitts, Feb. 19 Tr. at 71–72 (80 million cubic yards minus amounts contained in several small areas).

20. The absence of the excess spoil calculations and the regrade map would be especially relevant if mining were to begin under the

NWP, but the individual permit were denied. In that instance, presumably Hobet would have to restore the area to the regrade submitted in the original permit application. To do that, it would have to either draw spoil from valley fills or from regraded areas, in order to complete reclamation of the disturbed area, or else choose not to mine some areas of the permitted operation. *See* Feb. 19 Tr. at 61.

21. After the conclusion of the hearing, Defendant Miano produced the document purporting to state the fifty-foot rule, as well as a document purporting to render the rule void because it was not specifically stated within a new policy handbook. The existence and validity of the fifty-foot rule were raised early in the hearing, which stretched over four weeks. DEP had the opportunity to produce and authenticate these documents, subject to cross-examination. Production at this late date does not fully answer the difficult, serious question of the administration of the AOC rule.

The evidence demonstrates a serious question as to whether DEP is failing to apply a fifty-foot rule that remains applicable. Such actions may demonstrate arbitrary and capricious behavior of DEP in violating or ignoring what may be a mandatory, non-discretionary duty. Moreover, the evidence demonstrates Plaintiffs have raised substantial, serious questions going to the merits of whether Defendant Miano himself has breached mandatory, nondiscretionary duties in his application of the AOC requirement. These questions are so complex and difficult that they are "fair ground for litigation and thus for more deliberate investigation," *Manning*, 119 F.3d at 263.

### b. Illegal Segmentation

Under the NEPA, the Corps must prepare an EIS before any "major Federal action[ ] significantly affecting the quality of the human environment" is approvable. 42 U.S.C. § 4332(2)(C). The Corps may perform an EA if the significance of the environmental impact is not apparent at the outset. 40 C.F.R. § 1508.9. If the agency concludes an EA with a "finding of no significant impact" ("FONSI"), the agency has fully complied with NEPA. *South Carolina ex rel. Campbell v. O'Leary*, 64 F.3d 892, 896 (4th Cir.1995).

■ "A non-federal project is considered a 'federal action' if it cannot 'begin or continue without prior approval of a federal agency.'" *Maryland Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039, 1042 (4th Cir.1986) (citations omitted). An important factor in the determination of whether a non-federal project is "federal action" is the federal agency's " 'authority to exercise discretion over the outcome.'" *Id.* (citation omitted).

To determine whether the environmental effects are significant, the agency must ask:

whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

40 C.F.R. § 1508.27(b)(7). Thus, if the proposed action is separated into components to avoid significance, the proposed project would be illegally segmented. "We are committed to the proposition that when a major federal action is undertaken, no part may be constructed without an EIS." *Maryland Conservation Council*, 808 F.2d at 1042.

Our Court of Appeals has addressed the factors to be considered in addressing segmentation.[22] In *Maryland Conservation Council*, the Court considered not only the utility of the proposed component, but also whether the component involved such a dedication of resources that it would virtually force the agency to approve a later component as "a fait accompli." 808 F.2d at 1042–43. Accordingly, the Court must consider whether the "project would violate NEPA by limiting the choice of reasonable alternatives available to federal decision-makers." *State of N.C. v. City of Virginia Beach*, 951 F.2d 596, 602 (4th Cir.1991) (internal quotations and citations omitted). That is, the Court considers whether the completion of the first component has "a direct and substantial probability of influencing" the agency's decision. *Id.* at 603.

It is undisputed that the Spruce Fork mine requires a Section 404 permit from the Corps of Engineers before the operation begins. Under Circuit precedent, when such a major project requires the permitting approval of at least one federal agency, as the Spruce Fork mine does, it qualifies as a major federal action. *See*

---

**22.** The Court is aware of the Circuit's more recent unpublished decision, *New River Valley Greens v. United States Department of Trans-* *portation*, 161 F.3d 3, 1998 WL 633959 (4th Cir.1998). Because it is unpublished, the Court does not rely upon it.

*Maryland Conservation Council,* 808 F.2d at 1042.

Here, no NEPA review has been undertaken. The company has split the Spruce Fork operations into two phases: the first phase to be authorized under a "NWP 21"; the second phase is to be authorized, if at all, under an individual permit. The significance of this is substantial. NWP 21 is a categorical authorization of surface mining that "will cause only minimal adverse effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). NWP 21 received a categorical "FONSI" in 1996. If a permit falls within NWP 21's general parameters, it will not undergo the more careful review that an individual permit receives. Accordingly, if authorized under NWP 21, the first phase of Spruce Fork would receive a much less stringent review of the permit application by the Corps and would not be subject to any NEPA analysis.

Hobet readily acknowledges that the permit at issue is merely the "first phase" of its plans for Spruce Fork.[23] Mark White, the general manager for the Spruce Fork operation stressed the company has "a large investment made based on running large volumes, based on running the type of volumes that can be supported with the dragline operation." Feb. 19 Tr. at 193–94.

Plaintiffs have demonstrated a probability of success on the merits in their argument regarding illegal segmentation. The Court concludes that splitting Spruce Fork into two operations, the first of which will receive only minimalized scrutiny for its environmental effects, is a paradigmatic example of illegal segmentation. There is a strong potential that "construction and the concomitant expenditure of funds would create so much pressure" as to improperly influence the agency.

The Corps and Hobet argue that no improper segmentation occurs where, based on a Corps regulation, portions of a larger project proceed under an NWP, "while" the other portions are analyzed under an individual permit. *See* 40 C.F.R. § 330.6(d).[24] This argument fails, for purposes of the preliminary injunction, because there was no evidence adduced that the Corps is evaluating the remainder of the operation under an individual permit, but only, that Hobet *will* apply for one. Thus, instead of the Corps making a determination of the entire project at once under different programs, Hobet has phased the operation and not yet applied for an individual permit for other significant parts. Second, the Corps and Hobet note the regulation also states the Corps will not be prejudiced by the approval of the first portion. This case alleges a pattern and practice of officials violating their mandatory duties. Accordingly, a regulation stating that the agency will not be

---

**23.** When asked about the regrade of Spruce Fork after the revision, Hobet's expert Oren Kitts characterized the revision as an *"interim configuration."* Feb. 19 Tr. at 61 (emphasis added).

**24.** That provision states:

Subject to the following qualifications, *portions of a larger project may proceed under the authority of the NWPs while the DE evaluates an individual permit application for other portions of the same project,* but only if the portions of the project qualifying for NWP authorization would have independent utility and are able to function or meet their purpose independent of the total project. When the functioning or usefulness of a portion of the

total project qualifying for an NWP is dependent on the remainder of the project, such that its construction and use would not be fully justified even if the Corps were to deny the individual permit, the NWP does not apply and all portions of the project must be evaluated as part of the individual permit process.

(1) *When a portion of a larger project is authorized to proceed under an NWP, it is with the understanding that its construction will in no way prejudice the decision on the individual permit for the rest of the project.* Furthermore, the individual permit documentation must include an analysis of the impacts of the entire project, including related activities authorized by NWP.

33 C.F.R. § 330.6(d) (emphasis added).

prejudiced by a decision on the earlier phase lacks the force it might have in other circumstances. *Contra State of North Carolina,* 951 F.2d at 602.[25] Suffice it to say that although applicable law is not settled on this issue, serious legal questions exist.

Although Spruce Fork's first "phase" certainly possesses some independent utility, that is, the mining of coal within its borders, that utility alone may not sustain the phasing of operations. Instead, one must consider the vast dedication of resources to the Spruce Fork operation, including the investment in the permit property itself,[26] the permitting application process, moving the equipment to the site, readying the site for mining, and the cost of mining operations, not to mention the cost of litigating the permits. Second and equally important, completion of the first phase may limit the agency's "choice of reasonable alternatives" because, once this portion of the mountain is clear-cut and mined, and the valley fills created, the environmental harm is final and irreversible. It is probable that Hobet would emphasize in the second permitting process, as it did before the Court, the financial importance of avoiding having the dragline idle for any time as well as the significant ripple effect that suspension of this mining operation would have on the local and state economy.

In summary, it seems apparent the operations were split intentionally to allow the commencement of mining operations under a less critical agency review and to delay more detailed scrutiny until after significant work has begun. Because completion of the first phase has a direct and substantial probability of influencing the second phase, splitting the operations in an effort to avoid significance appears to violate NEPA.

### c. Other Serious, Legal Questions Exist

Finally, the Court again notes that these are but two of the many areas in which Plaintiffs have demonstrated serious, substantial and difficult questions going to the merits of the case. These questions include whether DEP made its required findings before granting the buffer zone variance or the contemporaneous reclamation variance;[27] whether valley fills must meet AOC; whether alternative, off-site locations exist for excess spoil; and when the contemporaneous reclamation 180-day period[28] begins to run, including the ad-

25. Even where such a regulation did have effect, the Fourth Circuit recognized the possibility of such dedication of resources as to effectively force the agency to act under extreme pressure. *See State of North Carolina,* 951 F.2d at 602.

26. Mark White testified that the current book value of Spruce Fork is $70 million, which is substantially less than the initial investment.

27. For instance, the Court notes particularly the serious questions raised regarding DEP's having made findings before granting the buffer zone and contemporaneous reclamation variances.

Ken Stollings, DEP permit review engineer and team leader for the Spruce Fork permit review team, was questioned about where his findings for granting variances were listed. When questioned about his single-sentence legal conclusions, Stollings' beliefs regarding his role as a permit reviewer became patently clear. Stollings stated, "Now, I do not provide a justification for Hobet to do this. I simply state that their justification is found within their permit and that I have reviewed it," Feb. 17 Tr. at 166, and "Hobet provides the justification, I only review it." *Id.* at 168.

Furthermore, Stollings repeatedly stated his belief regarding the excellence of the permit application. *See, e.g.,* Feb. 17 Tr. at 115. The putative excellence of a permit application does not relieve an agency of its mandatory, nondiscretionary duty to make findings before it issues a permit. Similarly, the number of hours that agency personnel have spent reviewing a permit application are not, by themselves, evidence of the agency having made its required findings or evidence of the soundness of the application.

Moreover, the Court discounts Mr. Stollings' testimony as patently unreliable. His testimony reflected continuing refusals to answer any questions that might be helpful to Plaintiffs or to concede any deficiency of DEP in the permit review process.

28. As part of the contemporaneous reclamation standards, a mining company must regrade the disturbed area within 180 days after it completes the mining in that area.

ministration of bond releases; and whether the Corps violates the CWA by allowing Hobet to seek a NWP 21 for the Spruce Fork operation.[29]

### 3. Public Interest

■ Finally, the Court considers the public interest. It is apparent that, in the face of such serious and complex legal questions presenting imminent and irreversible environmental harm, the public interest favors preservation of the status quo until the Court is able to rule finally on the merits at trial.

### C. Posting of a Bond

■ *Rule* 65(c), *Federal Rules of Civil Procedure,* provides as follows:

> (c) Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, *in such sum as the court deems proper,* for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.

Fed.R.Civ.P. 65(c) (emphasis added). The Court, mindful of controlling precedent from our Court of Appeals, does not have discretion to dispense entirely with the question of whether or not to require the posting of a bond. *See e.g., District 17, UMWA v. A & M Trucking, Inc.,* 991 F.2d 108, 110 (4th Cir.1993) ("A & M first argues that the district court's failure to require the Unions to post security for the issuance of the preliminary injunction was error. We agree."); *Maryland Dep't of Human Resources v. United States Dep't of Agric.,* 976 F.2d 1462, 1483 & n. 21 (4th

Cir.1992) ("The rule is unambiguous, and the '[f]ailure to require a bond before granting preliminary injunctive relief is reversible error.' "); *see also* Erin Connors Morton, Note, *Security for Interlocutory Injunctions under Rule 65(c): Exceptions To the Rule Gone Awry,* 46 Hastings L.J. 1863, 1876 (1995) ("The Fourth Circuit [has] found the bond requirement of Rule 65(c) to be a mandatory one....")

Nonetheless, the Court believes, pursuant to the unambiguous language of *Rule* 65(c), that it possesses significant discretion in setting the amount of the bond. *District 17,* 991 F.2d at 110 n. 2; *Human Resources,* 976 F.2d at 1483; *see West Virginia Highlands Conservancy v. Island Creek Coal Co.,* 441 F.2d 232, 236 (1971) (Conservancy, a nonprofit membership corporation dedicated to preserving natural, scenic, and historic areas in West Virginia highlands, was required to post nominal $100 bond in preliminary and permanent injunction against forest supervisor and coal company to halt certain mining and timber-cutting activities in forest areas.).

Indeed, commentators have observed the propriety of requiring little or no security in litigation of this type:

> [I]t is common for courts in environmental cases brought by environmental groups or individuals with limited means, particularly in NEPA cases, to require little or no security.

Daniel Riesel, *Temporary Restraining Orders, Preliminary Injunctions, and Stays Pending Appeal in Environmental Litigation,* SA85 A.L.I.–A.B.A. 899, 955 (1996) (citing numerous cases); *see also* 11A

---

**29.** Although it does not impact on the particular preliminary injunction at hand, evidence was adduced on yet another serious, legal question, that is, the granting of AOC variances based on impermissible post-mining land uses.

    Furthermore, throughout the evidence, the Court found examples of potentially inappro-

priate deference in decision-making. That is, there were instances in which one agency or team within an agency charged with making a particular finding blindly relied upon a somewhat similar finding made by another agency or team, without any exercise of independent agency expertise or discretion.

Charles A. Wright, Arthur R. Miller, Mary Kay Kane, Fed.Prac. & Proc.Civil 2d § 2954 (2d ed.1995).[30]

Based on the foregoing authorities, and the factors and discussion contained in them, the Court deems a bond in the amount of $5,000 to be appropriate under the circumstances.[31] If it should be determined this injunction was issued wrongfully, Plaintiffs' loss of the bond proceeds would be a significant financial deterrent to similar applications. Any other result would effectively deny Plaintiffs' right of judicial review of the challenged policy, practices and conduct of Defendants. Accordingly, Plaintiffs are **ORDERED** to post security pursuant to *Rule* 65(c) in the amount of $5,000 in cash or bond.

### III. CONCLUSION

Accordingly, the Court **GRANTS** Plaintiffs' motion for a preliminary injunction and the Court **ISSUES** a preliminary injunction for the Plaintiffs and against the federal Defendants, Defendant Miano, and the Arch subsidiaries. The Preliminary Injunction restrains the federal Defendants from issuing any further permits for the Spruce Fork mine, stays any permits previously issued by Miano for the Hobet Spruce Fork mine, and enjoins the Arch subsidiaries from commencing or continuing with any pre-construction or mining activities for the Spruce Fork operation until the Court resolves the case on the merits. Finally, Plaintiffs are **ORDERED**

to provide security pursuant to *Rule* 65(c) in the amount of $5,000.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to all counsel of record by **FACSIMILE** and by first class mail.

---

**30.** Another commentator has observed as follows:

> During the 1970s [courts] developed a narrow exemption to allow indigents and public interest groups, without posting security, to seek injunctive relief requiring the government to properly administer public programs. The reasoning was clear: Congress had granted rights or other benefits to the plaintiff classes which could not effectively be pursued if security had to be posted. Plaintiffs in such cases are merely surrogate attorneys general, enforcing federal law in the absence of government enforcement. If the government had enforced, the private defendants would have been barred from receiving security by Rule 65(c).

Jeffrey G. Miller, *Private Enforcement of Federal Pollution Control Laws Part II*, 14 Envtl. L.Rep. 10063, nn. 87–90 and accompanying text (1984).

**31.** The Court does not mean to burden the Court of Appeals with a restatement of its analysis from the Court's February 23, 1999 Order Granting Extension of Temporary Restraining Order. The same considerations and rationale in setting the security that governed the Court's February 23 determination govern its decision today. As well, the Court considers the significant financial deterrent effect that would result if Plaintiffs lose their bond.

The Court notes Plaintiffs have posted the $5,000 security, by check, in accordance with the February 23 Order.