**OHIO RIVER VALLEY ENVIRON-MENTAL COALITION, INC. et al., Plaintiffs,**

v.

**Michael C. CALLAGHAN, et al., Defendants.**

No. Civ.A. 3:00–0058.

United States District Court, S.D. West Virginia, Huntington Division.

March 8, 2001.

443

Charles Kincaid, Huntington, WV, Walton D. Morris, Jr., Theodore J. Korth, Carmel Nelson & Dugger, Charlottesville, VA, for Plaintiffs.

Benjamin L. Bailey, Brian A. Glasser, Bailey & Glasser LLP, Robert G. McLusky, James R. Snyder, Jackson & Kelly, Charleston, WV, for Defendants.

## MEMORANDUM OPINION CONCERNING THE PRELIMINARY INJUNCTION

CHAMBERS, District Judge.

This matter is before the Court upon a motion by Plaintiffs Ohio River Valley Coalition and the Citizens Coal Council for a preliminary injunction. After holding a five-day hearing on the matter, the Court **DENIES** the preliminary injunction sought by Plaintiffs for the following reasons.

## I.

### Introduction

This case arises from a proposal by the West Virginia Department of Environmental Protection (DEP) to approve a surface-mining permit for Mingo–Logan, one of the Intervenors in this action, to mine a ridge top in the headwaters of Island Creek. Although extensively deep mined in the past, there has been little surface mining in this area. The permit at issue (the Phoenix #2 mine site) covers 562 acres adjacent to an existing surface mine operation (the Phoenix #1 mine site) involving Mingo–Logan. The cumulative hydrologic impact assessment (CHIA) performed by Defendant concludes that the project is designed to prevent material damage to the hydrologic balance and, thus, supports issuance of the permit.

A critical part of the CHIA is the surface water run-off analysis obtained by Mingo–Logan. Recognizing the history of flooding in Island Creek, DEP required Mingo–Logan to design the operation to eliminate any contribution to the potential for flooding. The analysis considered certain site specific characteristics, assumed certain permit requirements designed to mitigate any increase in surface run off due to mining, and predicted the impact of a one hundred year/twenty-four hour storm. The analysis concluded that the project was designed to prevent any greater run-off than would occur pre-mining. In fact, the analysis found that certain best management practices and the use of small valley fills would not only reduce the site's contribution to flooding but lessen the extremes in high and low flows of the receiving streams.

Plaintiffs challenge the CHIA, claiming that in conducting the assessment and reaching its conclusions, Defendant violated several mandatory, nondiscretionary duties. Plaintiffs seek a preliminary injunction to restrain Defendant from issuing any permit until a final decision on the merits.

## II.

### Preliminary Injunction Analysis

█ As the Court found in its previous Order entered on June 27, 2000, the appropriate standard to apply in determining whether or not a preliminary injunction should issue is found in·*Blackwelder Furniture Company v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir.1977). In *Blackwelder*, the Fourth Circuit outlined the factors a district court must consider in determining whether or not a preliminary injunction should issue. ˙These four factors are: "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest." *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir.1991) (citation omitted). Balancing the respective harms is the most important aspect of the *Blackwelder* analysis. *Id.* If the balance weighs heavily in favor of a plaintiff, and if the plaintiff has "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation," then the preliminary· injunction should be granted. *Blackwelder*, 550 F.2d at 195 (internal quotation and citations omitted). However, the more the balance tips away from a plaintiff, the heavier the burden is for the plaintiff to show that he will succeed on the merits. *Rum Creek Coal Sales, Inc.*, 926 F.2d at 359.

## III.

### The Likelihood of Prevailing on the Merits

This Court is not permitted to conduct a broad review of Defendant's CHIA or permit approval. Rather, the jurisdiction of this Court is limited to determining whether Defendant violated mandatory, nondiscretionary duties. The Court previously considered which of Plaintiffs' claims in their amended complaints stated valid claims meeting the test required by 30 U.S.C. § 1270(a)(2). *See* the Court's *Memorandum Opinion and Order* entered on June 15, 2000, and subsequent Orders entered on June 22,2000, and June 27, 2000, granting, in part, injunctive relief as to permit revisions on Hominy Creek.

In those Orders, this Court sought to distinguish the necessary elements of a CHIA which constitute nondiscretionary duties of Defendant from characteristics of a CHIA left to the Defendant's discretion. While this Court is authorized to define and enforce those duties, it may not impose upon Defendant its judgment˙contrary to Defendant's exercise of his discretion. In several respects, Plaintiffs implicitly ask the Court to do just that. In his closing, Plaintiffs' counsel argued that four specific mandatory, nondiscretionary duties were violated by Defendant. The Court will address each of these duties in turn.

### A.

█ First, Plaintiffs contend that Defendant relied upon inadequate baseline sampling of the streams draining this part of the Island Creek watershed. Those samples, Plaintiffs assert, cannot provide a scientifically determinable description of the seasonal variation· of the receiving streams. Most of the samples were taken during periods when low flow would be expected, and few, if any, flow measurements in the sampling reflect contemporaneous rainfall events. In short, Plaintiffs argue that the Defendant˙has too little data from baseline samples to predict flow during wet periods or rainfall events. To some extent, the evidence on this point typifies a battle of experts, each expressing with varying degrees of specificity and assurance what standard should be followed. Those standards range from a minimum of twelve consecutive months of hourly readings of stream flow advocated by Plaintiffs' experts to simple compliance with the Defendant's CHIA memoranda

suggesting one sample per month for six different months. While more data is preferable, the Court again declines to impose Plaintiffs' recommendation as a standard inherent to Defendant's duty to require and consider baseline data. The regulations require water quality and quantity descriptions which include "information" on seasonal flow rates and seasonal variations. 38 C.S.R. 3.22.C.2. This Court previously recognized Defendant's discretion to decide what amount and source of baseline data is sufficient. *See* page 14 of the Court's *Opinion* entered on June 15, 2000. Further, baseline sampling data may be augmented, as it was here, by field observations and other sources of information to allow the Director to perform his assessment of probable impact. Thus, the Court concludes that it is unlikely that Plaintiffs will prevail on the merits as to this asserted duty.

Plaintiffs also believe that the baseline data collected by the applicant or added by Defendant are insufficient for their second purpose, as data against which the performance of the mining activity may be compared. The Court understands that Plaintiffs want to use the CHIA and its supporting information as an enforcement tool. While this is a legitimate use of the CHIA, its fundamental purpose is to guide the design of the project. Noncompliance with design requirements and regulatory standards may be demonstrated by reference to the CHIA, but what dictates the content and supporting information of a CHIA is the design function, not its utility as an enforcement tool.

### B.

■ Plaintiffs also argue two interrelated claims that the material damage limits contained in the CHIA are inadequate. First, the CHIA does not explicitly incorporate the state water quality standards as a component of the material damage threshold limits or ranges. Second, the definition used in the CHIA of material damage is, in Plaintiffs' view, vague and

unenforceable. The Court disagrees. The material damage limits section of the CHIA notes the National Pollutant Discharge Elimination System (NPDES) limits which will apply to the discharge points and the water quality limits for the receiving steam, Island Creek. This section then states that material damage will occur when the quality or quantity of the groundwater and surface water is sufficiently altered from the baseline and intended use for the water is significantly impacted. In this context, "use" means the legislatively designated water quality standards associated with the categorical uses described in the state rules. Given the absence of any other description or criteria in the statutes or regulations to further condition the duty to define "material damage," the Court is unable to find this element of the CHIA fatally defective. Although perhaps not the definition most appropriate to protect the environment or enhance the condition of Island Creek, this material damage limit is within the Director's discretionary judgment. That this definition provides little objective or quantitative guidance as an enforcement tool is beside the point. The CHIA is primarily a design tool, and its role in enforcement is indirect.

### C.

■ Plaintiffs contend that DEP's placement of Island Creek on the § 303(d) list precludes the findings made by the Director that the operation is designed to prevent material damage to the stream. The § 303(d) list is a Clean Water Act (CWA) mandated list of streams impaired by pollution. 33 U.S.C. 1313(d). In general, that provision requires a state to identify those streams which fail to meet water quality standards and to determine the total maximum daily load (TMDL) of pollutants the stream can carry without further violating water quality standards. This total load would then be apportioned by the state regulatory agency among the permitted discharges into the stream.

The result, and goal, is to decrease the permissible level of pollutants to be discharged.

Unquestionably, Island Creek has remained on this list since this mandate was enforced, even when the list was reissued in 1998. The listing notes "metals" associated with mining and appears to cover the entire length of Island Creek as opposed to any discrete segment. The list categorizes Island Creek as a stream of low priority, meaning TMDLs will not be issued for a number of years while DEP focuses on high priority streams. Plaintiffs ask the Court to presume that Island Creek's placement on the list established water quality conditions so poor, at least as to the levels of iron pollution, that any further contribution of iron, even within normal effluent discharge limits, would cause material damage. The Court declines to do so for two reasons. First, the relationship between the CWA's § 303(d) list and the "material damage" element of the CHIA required Surface Mining Control and Reclamation Act of 1977 (SMCRA) is too attenuated as a matter of statutory construction. There is no express reference in SMCRA to the § 303(d) list, nor any reason the effect of the listing cannot be determined when Mingo–Logan seeks the NPDES permit. Second, the presumption advocated by Plaintiffs is belied by the evidence of Island Creek's actual condition, at least in its headwaters where this operation is proposed. Although hardly characterized as pristine, the portion of Island Creek within the CHIA is, by all accounts, in relatively good condition today. In particular, metals associated with mining have been fairly analyzed by DEP and considered in the CHIA based on actual data, not presumed stream quality.

### D.

■ The final duty assertedly broken relates to the monitoring plan requirements. Here, Plaintiffs argue that the lack of baseline data, to which one may compare future data collected from monitoring, renders the plan useless. For instance, the baseline stream flow data offers little evidence with which to compare to flows during and after mining. Also, Plaintiffs point out that the surface water run-off monitoring required does not specifically include measuring rainfall impact or provide a basis upon which the Surface Water Run–Off Analysis (SWROA) model may be verified. Plaintiffs next contend that the plan fails to discuss how sites were chosen or how the data will be used to determine compliance or noncompliance with the design or performance of the operation.

Plaintiffs have a strong emotional basis for some of their concerns. Relying on the validity of the SWROA model to predict the operation will not cause or contribute to the potential for flooding understandably increases Plaintiffs' anxiety. Yet, Plaintiffs concede the model is sound, even praiseworthy. Experts on both sides agreed such models are generally accepted in the scientific community. No expert challenged the findings of the SWROA or contradicted its assumptions with evidence of bad data or flawed principles. The analysis led DEP to insist on surface water run-off routing structures and sediment controls designed to prevent the operation from discharging more run-off during and after mining than could be discharged today. Concluding that the model demonstrated the design capacity of these controls to accommodate the equivalent of a one hundred year/twenty-four hour rainfall, DEP has determined that the permit's monitoring plan is sufficient. In so finding, the CHIA plainly notes that the drainage controls and best management practices are essential to its material damage finding. Therefore, inspection and enforcement of these provisions of the mining plan provide assurance that the operation will perform as designed, and Defendant may take this into consideration in approving the monitoring plan proposed by the permittee. The Court construes

the CHIA and Defendant's rationale for approval of the surface water monitoring plan to be consistent with the Order entered on June 15, 2000.

The groundwater monitoring plan is problematic because the Director approves use of a residential well already high in iron as the down gradient monitoring site. As was the case in the Director's approval of groundwater monitoring for Hominy Creek, the Director chose to approve a site already discounted by DEP and the permittee. Iron in high concentrations has been reported in the baseline sampling. Despite concern generally over mining activities causing increased iron in the area, the Director and Mingo–Logan assume that the high iron levels in this well are due to stirring up, the well water when samples are taken. An identical argument was used by Defendant to ignore or minimize high levels in wells near Hominy Creek. Concluding that high iron is endemic to residential wells and not an indicator of present day mining activities, he nonetheless intends to rely on one such well as the only monitoring site for the impact of this operation on groundwater.

Given the geology and hydrology associated with the ridge to be mined, Defendant may fairly conclude that little water will percolate from the mining area to the groundwater and that any contribution of iron will be minimal. However, choosing a monitoring site to sample for iron (and other metals) knowing that iron is expected makes little sense. Further, between this proposed operation and the monitoring site are two pending surface mine permits (SMA 5015–98 & 5016–98) noted in this CHIA. Despite this flaw in the plan, the Court notes that the plan also requires inspection and sampling of flows from the fill areas, including any seeps. These requirements reduce the risk of depending in the monitoring plan on the single groundwater site and minimize the practical problem of relying on ambiguous results of well testing. The Court's skepticism does not

rise to the level necessary to find a probable violation of Defendant's duty.

## IV.

### The Harms at Issue and the Public Interest

### A.

### The Harm to Plaintiffs if the Injunction is Denied

Plaintiffs claim that issuing the permit will cause imminent and irreparable harm by allowing mining to begin without first establishing clear, enforceable, predetermined water quality and quantity limits and ranges. Without more baseline data, Plaintiffs contend that it is impossible to determine the onset of material damage to the hydrologic balance. In addition, if such baseline data is not collected prior to the start of the mining operations, Plaintiffs assert that the ability to collect such data will be forever lost. Moreover, if the baseline data is not collected, Plaintiffs insist that their ability to administratively or judicially require Mingo–Logan to prevent material damage to the hydrologic balance will be seriously impaired. Plaintiffs also claim irreparable harm to the environment in that authorizing the operation would cause or contribute to recurring violations of Island Creek.

### B.

### The Harm to Defendant Callaghan if the Injunction is Granted

Defendant argues he will suffer harm because the injunction would interfere with the systematic effort DEP has taken to improve the CHIA process and the permitting requirements to better protect the environment. In addition, Defendant contends the fact he has to defend himself in multiple forums (before this Court, the Surface Mining Board, and other courts) creates the potential for conflicting results.

## C.

### The Harm to Mingo–Logan if the Injunction is Granted

Mingo–Logan alleges that the issuance of a preliminary injunction by the Court will cause it harm because it must move its equipment and employees, over the next eight to ten weeks, from its current mining operations on its Phoenix # 1 mine site to the Phoenix # 2 mine site. If the permit is not issued within that time, Mingo–Logan asserts that it will have to phase out mining on Phoenix # 1 and begin reclamation of that site. If the operations are not moved in advance of the reclamation, Mingo–Logan claims that the reclamation project will hinder its ability to move its operations onto the Phoenix # 2 site because the two sites are adjacent to one another and involve the same seams of coal. Delay pending a final decision could force Mingo–Logan to abandon its plan to mine this site indefinitely, perhaps forever.

Mingo–Logan also asserts that there is a serious threat of economic harm if the permit is not issued. First, Mingo–Logan claims that, after the permit is issued, it will transfer mining operations to a related entity which currently employs 130 people. If the permit is not issued, many of those employees will be laid off from work, economically harming Mingo–Logan and its related entity. Mingo–Logan further claims that there is 3.5 million tons of coal on the Phoenix # 2 mine and mining this coal will produce hundreds of thousands of dollars in taxes, which will be used by schools, the local government, and the State. If, however, the mining does not proceed, these tax revenues will be lost. In addition, a failure to issue the permit will eliminate many potential jobs for local contractors and their employees who provide mining related services. Mingo–Logan argues that such a loss will be a significant hardship on Logan County, as it is already an economically depressed area.

## V.

### Balancing the Harms

Given the Court's view that it is unlikely Plaintiffs will prevail on the merits as to this particular CHIA, the Court finds the balance of harms weighs against granting the injunction. The "process" harm Plaintiffs focus on cuts both ways. To some extent, as noted in part III, Plaintiffs' claim of irreparable harm is based on their view that the CHIA is a citizen enforcement tool. If that role was the primary purpose of the CHIA as a matter of statute, the Court might well conclude that Plaintiffs have demonstrated irreparable harm so tipping the balance that they would be entitled to relief. At this stage of the litigation, the Court is not prepared to ascribe that purpose as primary to the CHIA duties, so the Court cannot assign such weight to that element of harm to Plaintiffs. To evaluate these claims of irreparable harm to Plaintiffs, the Court is guided by its examination of the fundamental purpose of the CHIA. More baseline and monitoring data as to quality and quantity, including seasonal flows, would serve Plaintiffs' interests in using the CHIA to enforce compliance. But the issue for this Court is not whether the CHIA meets that test; rather, the issue is whether the CHIA meets the minimum requirements to fulfill Defendant's mandatory, nondiscretionary duties. Further, the rights of Plaintiffs to pursue administrative relief, with perhaps less of a burden in terms of the standard for review by the adjudicator, mitigate this harm. While not required to seek administrative review, its availability offers avenues of relief which could consider the fact issues raised here.

Finally, the harm to the environment in this case is far less than that presented in *Bragg v. Robertson,* 54 F.Supp.2d 635 (S.D.W.Va.1999). At issue there was the legality of permits authorizing valley fills which completely destroy stream segments and their watersheds. As designed, so-called "mountaintop removal" operations

require the placement of overburden into streams and valleys, resulting in serious harm to the stream community and its diversity. Whether such operations properly could be permitted under the interwoven applicable regulatory schemes was the controlling legal issue raised by the plaintiffs in *Bragg,* and the harm was an inevitable consequence of the operation as designed and permitted. This case is fundamentally different. At this point, the evidence does not support a finding that the operation will cause or contribute to water quality violations or even significant changes to the receiving stream or its tributaries. The hydrologic balance outside the permit area will not be adversely affected if the operation complies with the permit requirements.

## VI.

### The Public Interest

The public interest in this matter includes the economic consequences pointed out by Mingo–Logan and the disruption of the state regulatory schemes when litigated in court. However, these harms do not outweigh the strong interest of the public in protecting the environment and assuring that policies of elected representatives are carried out by bureaucracies assigned that responsibility. That overriding public interest anticipates the exercise of some measure of discretion by the regulatory officials. In this preliminary injunction proceeding, the Court cannot ignore the fact that such discretion is part of the public policy and public interest.

## VII.

### Conclusion

In denying the preliminary injunction, the Court emphasizes the narrow scope of its review. Plaintiffs posit reasoned arguments that, in several respects, the CHIA fails to adequately consider certain factors. The breach of duties, here, necessarily revolve around fact-intensive disputes, and not so much questions of law.

The Court cannot enjoin Defendant on anything less than a failure to meet the minimum requirements of the various mandatory non-discretionary duties. Defendant could without much cost or delay easily remedy some of those deficiencies argued by Plaintiffs. For instance, new or additional groundwater monitoring sites or a more explicit and extensive surface-water monitoring plan would alleviate some of Plaintiffs' concerns. Similarly, Defendant's vulnerability to a legal challenge to the baseline data in this case would be minimized by sampling more representative of West Virginia's wet and dry periods in a typical year. In this particular CHIA, the Court cannot find it likely that these deficiencies will sustain a final conclusion that Defendant breached his duties. However, this decision is driven in great measure by the fact that this operation is relatively small and in an hydrologically remote area. Accordingly, for the foregoing reasons, the Court **DENIES** Plaintiffs' motion for a preliminary injunction.

The Clerk is directed to forward a copy of this Order to counsel of record and any unrepresented parties and to publish this Opinion at *www.wvsd.uscourts.gov.*