No. 1101.   NAMED INDIVIDUAL MEMBERS OF THE SAN
ANTONIO CONSERVATION SOCIETY *v.* TEXAS HIGHWAY DE-
PARTMENT ET AL.   Petition for certiorari before judgment
to C. A. 5th Cir.   Certiorari denied.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS
and MR. JUSTICE BRENNAN join, dissenting.

This case disturbs me greatly.   On December 7, 1970,
this Court stayed the construction of two federally
funded highways in order to save two public parks, *ante,*
p. 939.   One park serves the people of Memphis, Ten-
nessee.[1]   The park in this case is for the rest and recrea-
tion of the people of San Antonio, Texas.   Both cases
involve important and timely problems of interpretation
of § 18 (a) of the Federal-Aid Highway Act of 1968, 23
U. S. C. § 138 (1964 ed., Supp. V), passed by Congress to
stem the destruction of our Nation's parks by highway
builders.   These cases give this Court an opportunity
to insure that lower courts and certain federal agencies
administer this vital environment-saving legislation in
the way that Congress intended.   The Tennessee case
is still scheduled for oral argument at the earliest possi-
ble date—January 11, 1971.   Yet, the Court now dis-
solves the stay previously entered in the San Antonio
case by denying certiorari.   I respectfully dissent from
such action.

The San Antonio park has two golf courses, a zoo,
a sunken garden, an open-air theater and many acres of
open space, covered with trees, flowers, and running
brooks.   It is a lovely place for people to retreat from
the frantic pace of bustling urban life to enjoy the simple
pleasures of open space, quiet solitude, and clean air.
It is a refuge for young and old alike—the kind of a
park where a family man can take his wife and children
or lovers can while away a sunny Sunday afternoon to-

---

[1] See No. 1066, *Citizens to Preserve Overton Park, Inc.* v. *Volpe.*

gether. After today's decision, the people of San Antonio and the birds and animals that make their home in the park will share their quiet retreat with an ugly, smelly stream of traffic pouring down a super six-lane "North Expressway." Trees, shrubs, and flowers will be mown down. The cars will spew forth air and noise pollution contaminating those acres not buried under concrete. Mothers will grow anxious and desert the park lest their children be crushed beneath the massive wheels of interstate trucks.

The San Antonio Conservation Society and its individual members filed suit to block federal approval and funding of this expressway. The United States District Court held that the Secretary of Transportation and state officials were free to proceed with federal funding and construction of two segments of the road coming into the park from north and south. It retained jurisdiction to review any later decision on the design and routing of the connecting middle section, which had not been formally approved by the Secretary.

In addition to substantial questions under the Federal-Aid Highway Act, this case involves the newly enacted National Environmental Policy Act of 1969, Pub. L. 91–190, 83 Stat. 852. The latter requires a detailed study of the probable effects before approval of "major Federal actions significantly affecting the quality of the human environment." 42 U. S. C. § 4332 (C) (1964 ed., Supp. V). Even respondent Secretary of Transportation appears to concede that the decision to fund this expressway is a "major federal action" requiring careful study because he has promised that a study will be made before the middle section is approved. However, the approval of the two end segments took place in August 1970, eight months *after* the effective date of the Act. It is undisputed that no environmental study has been made with respect to these two segments,

which themselves desecrate parklands and which make the destruction of further parkland inevitable.

Section 18 (a) of the Federal-Aid Highway Act provides:

> "It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands : . . . [*T*]*he Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park*, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof. . . . as so determined by such officials *unless (1) there is no feasible and prudent alternative to the use of such land*, and (2) such program includes all possible planning to minimize harm to such park . . . ." (Emphasis added.)

Even the Secretary admits that he has failed to make formal findings about feasible and prudent alternative routes. Respondents have argued that formal findings are unnecessary. This seems an unlikely reading of the Act because without findings it will be difficult for courts to review the Secretary's determinations, and the intent of Congress to protect parklands is likely to be frustrated.[2] Furthermore, it is simply not realistic to consider the construction of this expressway "section by section" as the District Court and the Secretary of

---

[2] Ironically, the Secretary of Transportation now appears to recognize that written findings should be made for highway grant-in-aid approvals and such findings are now provided for by his own regulation, Dept. of Transportation Order 5610.1, issued Oct. 7, 1970. But the Secretary has not been willing to apply his regulation to this case. In my view the regulation alone is sufficient reason to reverse and remand for findings of fact. Cf. *Thorpe* v. *Housing Authority*, 393 U. S. 268 (1969).

Transportation have done here. Once construction is begun and heavy investment made on the two end segments, the available options for routing the middle segment are severely limited. In the words of the Act alternatives for the middle segment which were "feasible and prudent" will no longer be "feasible" once the two end segments are constructed.

In the last several years, Congress has enacted coordinated legislation designed to protect our Nation's environment from destruction by water pollution, air pollution, and noise pollution. This legislation has come about in response to aroused citizens who have awakened to the importance of a decent environment for our Nation's well-being and our very survival. Section 18 (a) of the Federal-Aid Highway Act and the National Environmental Policy Act are two major parts of this broad plan. The former was designed to prevent the systematic and thoughtless burial of public parks under the concrete of federally funded highways. The implementation of this legislation by the Department of Transportation is disheartening. The Act prohibits the Secretary from approving highway construction through parklands unless there is no "feasible and prudent" alternative. Congress has assigned a high value to parks, trees, and clean air. Parks are not to be condemned and taken in order to try to save a few dollars on a multimillion-dollar highway project. Congress was willing to sacrifice parks only when there is "no feasible alternative." Yet the Secretary has proceeded without formal findings to approve two segments of a highway which devour parkland. And the two segments now approved stand like gun barrels pointing into the heartland of the park. The Secretary and his staff are not wholly inexperienced in highway construction. They know full well the difficulty of preserving the park's heartland once the barrels have been loaded and the guns cocked. The efforts of our citizens and the

Congress to save our parklands and to preserve our environment deserve a more hospitable reception and more faithful observance than they have apparently found either in the Executive Branch or, thus far, in the courts.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK and MR. JUSTICE BRENNAN concur, dissenting.

This case is here on a stay presented to MR. JUSTICE BLACK and by him referred to the Court. We granted a stay pending consideration of a petition for certiorari before judgment of the Court of Appeals for the Fifth Circuit, *ante,* p. 939, which has now been filed. The Court dissolves the stay and denies certiorari, without any opinion. I dissent. This is an important case that involves the construction of 9.6 miles of an expressway through 250 acres of the Brackenridge-Olmos Basin parklands situated at the headwaters of the San Antonio River within the city of San Antonio. It involves the application of a new law—the National Environmental Policy Act of 1969, 42 U. S. C. § 4331 (1964 ed., Supp. V), which was signed by the President on January 1, 1970. The new Act applies by § 102 (2) to "all agencies of the Federal Government" and provides that such agencies shall include in every recommendation for

> "major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." § 102 (2)(C).

There can be no doubt that federal funding of a state highway project is covered by the 1969 Act. The most controversial aspect of the highway design and location is that it proposes to run a massive elevated eight- and six-lane expressway through a park in San Antonio. The Brackenridge-Olmos Basin parklands is a unique park, recreational, and open-spaces area. Specific land uses include the original Brackenridge Park grant, the Sunken Gardens, and adjacent outdoor amphitheater, the San Jacinto Park, the Alamo Stadium, the San Antonio Zoo, the Olmos Basin picnic area, the Franklin Fields, and numerous other parks, public, and open-space areas.

Many, including Senator Metcalf of Montana, had sounded the alarm over the devastation caused by federal highways: [1]

> "Today the land is being covered by four and six lane highways, supermarket parking lots, suburban

---

[1] Speech, Stanford University, April 9, 1969.

Senator Metcalf on January 24, 1963, spoke of the great need for consideration of ecological factors before highway construction was launched:

"When Congress adjourned last fall, I decided to determine the extent to which highway construction was threatening our streams and rivers. I sent questionnaires to fish and game management officials in each of our 50 States. To date, Mr. President, I have received responses from 46 States.

"The questionnaire consisted of 10 questions, one of which was: 'Are trout streams or other important fishing streams or lakes adversely affected by highway construction in your State?' Thirty-two of the forty-six States which have responded to the questionnaire answered affirmatively, although damage varies in seriousness from State to State.

"Perhaps more significant were the responses to the question: 'Do you feel that additional legislation at the Federal or State levels is necessary to bring about a satisfactory degree of coordination of highway and wildlife conservation interests and objectives in your State?' To this question, Mr. President, fish and game management men in 37 States replied, 'Yes.' Two States were undecided about

'high rise apartment buildings and lost to itself and to the people alike."

Parks—the breathing space of urban centers—were part of the concern of Congress, not only wilderness areas, rivers, lakes, and other aspects of the biosphere.[2] The Senate Committee stated in its report:

"The inadequacy of present knowledge, policies, and institutions is reflected in our Nation's history, in our national attitudes, and in our contemporary life. We see increasing evidence of this inadequacy all around us: haphazard urban and suburban growth; crowding, congestion, and *conditions within our central cities* which result in civil unrest and detract from man's social and psychological well-being; *the loss of valuable open spaces;* inconsistent and, often, incoherent rural and urban land-use policies; critical air and water pollution problems; *diminishing recreational opportunity;* continuing soil erosion; *the degradation of unique ecosystems;* needless deforestation; the decline and extinction of fish and wildlife species; *faltering and poorly de-*

the necessity for legislation, and only seven see no need for action in this area.

"Mr. President, my questionnaire revealed general agreement, among those most qualified to know, that there is a need for legislation. This is not a partisan, political issue; it is a conservation problem cutting across party lines, as shown by responses to my questionnaire. Fish and game officials working for Republican and Democratic State administrations agreed that there is a need for legislation to protect fish, wildlife, and recreation resources from damage due to highway construction.

"Our bill, Mr. President, provides a method of meeting that need. I urge my colleagues to study this problem as it relates to their own States. I hope this matter will receive the attention of the Congress this year." 109 Cong. Rec. 871.

[2] For the legislative history see the Appendix to this opinion.

*signed transportation systems;* poor architectural design and ugliness in public and private structures; *rising levels of noise;* the continued proliferation of pesticides and chemicals without adequate consideration of the consequences; radiation hazards; thermal pollution; an increasingly ugly landscape cluttered with billboards, powerlines, and junkyards; and many, many other environmental quality problems." S. Rep. No. 91–296, p. 4. (Italics added.)

The report noted that environmental programs were administered by 63 federal agencies located within 10 of the 13 departments, as well as in 16 independent agencies. *Id.,* at 6.

"[P]oor land-use policies and urban decay" can no longer be deferred, the report stated. *Id.,* at 5.

"We no longer have the margins for error that we once enjoyed. The ultimate issue posed by shortsighted, conflicting, and often selfish demands and pressures upon the finite resources of the earth are clear." *Ibid.*

And so the Act was drafted "to assure that all Federal agencies plan and work toward meeting the challenge of a better environment." *Id.,* at 9.

Yet in spite of this mandate embodied in § 102 (2)(C) the Department of Transportation has made no findings on the impact of this massive elevated freeway on the environment of San Antonio. The Court does not tell us why none need be made.

On August 4, 1970, the State, after revising its plans, agreed to the federal plan for the end segments of the projects. But we are advised that it was not until August 13, 1970, that the Secretary of Transportation approved the construction by Texas of the two end seg-

ments; and he has not yet approved the middle section. It is said:

> "The Secretary expressly reserved final approval on the middle section because there is much parkland contained in the middle section.
>
> "As a matter of fact, one of the primary reasons the Secretary has not approved the middle section is due to the consideration of the views expressed by plaintiffs in opposition to the proposed route the middle section will take through the parklands."

We were told on November 16, 1970, that there are "at least four (4) possible alternative routes on which the middle section could be constructed to connect the two ends which the District Court has approved."

That is to say, 11 months after the Environmental Policy Act became effective, the gist of the location problem so far as the park is concerned had not been resolved.

The Solicitor General contends that the two end segments were approved in 1969. But the facts are that while Secretary Volpe gave preliminary approval of these segments on December 23, 1969, he withheld authorization of federal funds pending an agreement by the State to study further the middle segment. As already stated, Texas agreed to the end segments on August 4, 1970, and the Secretary gave his "unqualified approval" and authorization of them on August 13, 1970, long after the new Act became effective. Yet no findings under the 1969 Act were made.

It seems obvious, moreover, that approval of the two end segments has some effect on the alternatives for the middle section. For, once the expressway is split into segments and each segment considered separately, the environmental impact of the entire project will turn, at least in part, on the fact that the two ends are already built.

The Solicitor General states: "The Secretary could well approve a route in the middle segment that would involve little or no use of parklands, or substantially less than the proposed route location now contemplates."

Thus we have a fair indication that some of the park is going to be a freeway regardless. Yet as I read the Act a federal highway project "significantly affecting" even an acre of parkland cannot be launched without a finding on the environmental consequences.

The legal questions posed by § 102 (2)(C) include at least the following:

Should any piece of the park be destroyed to accommodate the freeway?

How can end segments of a highway aimed at the heart of a park be approved without appraising the dangers of drawing a dotted line between the two segments?

How important is the park to the people of San Antonio? How many use it? For what purposes? What wildlife does it embrace? To what extent will a massive eight- and six-lane highway decrease the value of the park as a place of solitude or recreation?

What are the alternatives that would save the park completely? Could a passage by way of tunnels be devised? Could the freeway be rerouted so as to avoid the parklands completely and leave it as a sanctuary?

Is not the ruination of a sanctuary created for urban people an "irreversible and irretrievable" loss within the meaning of § 102 (2)(C)?

I do not think we will have a more important case this Term. Congress has been moving with alarm against the perils of the environment. One need not be an expert to realize how awful the consequences are when urban sanctuaries are filled with structures, paved with concrete or asphalt, and converted into thoroughfares of high-speed modern traffic.

Those are some of the things with which Congress was concerned in the 1969 Act.

No federal question would, of course, be presented if Texas or San Antonio decided to turn these parklands into a biological desert. But when Congress helps finance a project like this freeway,[3] it becomes a federal project. See *Wickard* v. *Filburn*, 317 U. S. 111, 131; *Ivanhoe Irrig. Dist.* v. *McCracken*, 357 U. S. 275, 295; *Simkins* v. *Memorial Hosp.*, 323 F. 2d 959. And if one thing is clear from the legislative history of this 1969 Act, it is that Congress has resolved that it will not allow federal agencies or federal funds to be used in a predatory manner so far as the environment is concerned. Congress has, indeed, gone further and said that the Department of Transportation, like other federal agencies, may no longer act as engineers alone and design and construct freeways solely by engineering standards. Congress has said that ecology has become paramount and that nothing must be done by federal agencies which does ecological harm when there are alternative, albeit more expensive, ways of achieving the result.

I would continue the stay, grant the petition for certiorari before judgment, 28 U. S. C. § 1254 (1), and let the bureaucracy know that § 102 (2)(C) is the law of the land to be observed meticulously.

## APPENDIX TO OPINION OF DOUGLAS, J., DISSENTING

Much of the legislative history of the Act is a discussion of air pollution, water pollution, and solid waste disposal. But when specifics are mentioned highway problems are present. And the mention of highway problems at every stage in the legislative history leaves

---

[3] The Federal Government is providing the funds for 50% of the cost of this expressway.

no doubt that the Department of Transportation's highway programs are subject to the Act.

At the Senate Hearing on the Act, the Department was represented by the Assistant Secretary for Urban Systems and Environment. He immediately recognized the reason he was present.

> "I think that perhaps the reason that the Department of Transportation was asked to have a representative here before your committee was because within the purview of the Department of Transportation has lain in the past and will continue to lie in the future many of the activities that, at least, are most apparent to the people of the country in the field of environmental impact."

He talked about the views of those people who live in metropolitan areas of the country. They have, he stated:

> "a growing concern, though in most instances it is not a deep knowledge perhaps of scientific implications . . . as to what might happen to life itself in some of the areas of which we are destroying our environment, it is concerned with the things that they see about them in their daily lives. And in this area, I think, transportation and the activities of transportation organizations have been one of those which they have observed and which has created perhaps as much controversy and concern as any other area of the State and Federal operations." Hearing on S. 1075, S. 237, and S. 1752, before the Senate Committee on Interior and Insular Affairs, 91st Cong., 1st Sess., 76

Included in the House Hearings is a letter from the Chairman of the House Subcommittee considering the 1969 Act to the Chairman of the President's Council on Environmental Quality which notes that neither the De-

partment of Transportation nor the Department of the Interior has promulgated the procedures it will use under the Act. "The fact that there has not been full compliance by these Departments disturbs me greatly." Hearings before the Subcommittee on Fisheries and Wildlife Conservation of the House Committee on Merchant Marine and Fisheries, Ser. No. 91–32, p. 69. And before the House Hearings were printed the Department of Transportation had complied with the request and the Department's procedures under the Act were printed with the House Hearings. *Id.*, at 153–159.

The debates on the Act on the floors of both Houses were relatively short, attesting in some measure to the popularity of enacting an extensive environmental bill. Yet just as the Senate and House Hearings had demonstrated that the Department of Transportation was an integral part of the Federal Government's creation of environmental problems, so, too, did the debates alert one to the fact that highways caused environmental problems when not approached from an ecological perspective. In the House only a handful of speakers discussed the bill for any length of time and all spoke in broad generalities. Representative Pelly, a member of the subcommittee which considered the Act, provided the focus on the problems of highways.

"We have experts in the field of transportation coping with the problem of moving people from one city to another in the least possible time with the greatest degree of safety. We have constructed a vast system of interstate highways to accomplish this. Yet at the same time, we have created serious problems of soil erosion, stream pollution and urban displacement. . . .

". . . The experts have, by and large, done their job well, but we must remember that their job is

building highways, increasing our food production, preventing floods, and so on. Their primary concern is not the quality of our environment considered as a totality." 115 Cong. Rec. 26573.

The Senate debates were also brief and again often dealt largely with the generalities of air and water pollution. Senator Allott, a member of the committee which considered the Act, recognized this and reminded his colleagues that more was involved.

"I think there is a little too much of a tendency, probably not in the committees involved here, but on the part of the public, to regard environment as involving only air pollution and water pollution. . . .

". . . [T]he environment does not involve only water and air; . . . it involves noise—and we are all becoming acutely conscious of this factor. More and more as time goes on—environmental questions will also involve land distribution, land planning for the future, what kind of future cities we will plan, and what we will do about the ghettos—for the ghettos are a part of the environmental picture . . . ." *Id.,* at 29061.

Senator Jackson, chairman of the committee which considered the Act, reviewed the legislative history of the Act for the benefit of the other Senators. He stated that concepts and ideas were drawn from the many other bills before Congress when the Senate Committee considered the Act. These bills

"were directly concerned with environmental issues, covering a broad area of interest—cleaning up the Nation's rivers and better approaches to smog control, improving the use of open space and prevention of disorderly encroachment by super-highways, factories and other developments . . . and the control

of urban sprawl, unsightly junkyards, billboards, and power facilities that lower the amenities of landscape." *Id.*, at 29068.

Thus there can be no doubt but that Congress intended the Act to apply to federally funded highways and the Department of Transportation.