OHIO VALLEY ENVIRONMENTAL COALITION, Coal River Mountain Watch, and Natural Resources Defense Council, Plaintiffs,

v.

William BULEN, Colonel, District Engineer, U.S. Army Corps of Engineers, Huntington District, and Robert B. Flowers, Lieutentant General, Chief of Engineers and Commander of the U.S. Army Corps of Engineers, Defendants.

No. CIV.A. 3:03–2281.

United States District Court, S.D. West Virginia, Huntington Division.

April 26, 2004.

James M. Hecker, Trial Lawyers for Public Justice, Washington, DC.

John W. Barrett, Appalachian Center for the Economy and the Environment Charleston Office, Charleston, WV.

Joseph M. Lovett, Appalachian Center for the Economy and the Environment, Lewisburg, WV.

Ruth Ann Storey, Thomas L. Sansonetti, U.S. Department of Justice, Environment & Natural Resources Division, General Litigation Section, Washington, D.C.

Terry C. Clarke, U.S. Army Corps of Engineers, Office of Counsel, Huntington, WV.

Steven E. Rusak, U.S. Department of Justice, Environment & Natural Resources Division, Environmental Defense Section, Washington, D.C.

Michael L. Keller, Kasey Warner, U.S. Attorney, U.S. Attorney's Office, Charleston, WV.

Russell W. Petit, U.S. Army Corps of Engineers, Office of Chief Counsel, Washington, D.C.

Cynthia J. Morris, U.S. Department of Justice, Environment & Natural Resources Division, Environmental Defense Section, Washington, D.C.

Robert G. McLusky, James R. Snyder, Jackson Kelly, Charleston, WV.

## ORDER

GOODWIN, District Judge.

Pending before the court is the Plaintiffs' Motion for a Temporary Restraining Order and/or a Preliminary Injunction [Docket 37]. I previously granted the plaintiffs' motion in part and issued a temporary restraining order on April 6, 2004 [Docket 39]. A hearing to consider further injunctive relief was held on April 12, 2004. I renewed the temporary restraining order on April 15, 2004 [Docket 50]. On April 19, 2004, the parties submitted supplemental briefs addressing issues raised at the April 12 hearing [Docket 54, 57, 60]. The hearing on the motion resumed on April 22, 2004.

The plaintiffs have supported their motion with several arguments, each of which raises serious questions going to the merits of this case. The plaintiffs have argued, for example, that the coal refuse that the Green Valley Coal Company (Green Valley) proposes to discharge into the waters of the United States should be regulated pursuant to Section 402 of the Clean Water Act (the Act) rather than Section 404; that the United States Army Corps of Engineers (the Corps) cannot issue authorizations to an applicant that has not first obtained state water quality certification for a project; that Nationwide Permit (NWP) 21 is arbitrary and capricious because it imposes no limit on the filling of perennial streams; and that NWP 21 is arbitrary and capricious because it allows mitigation to be used to offset environmental impacts that are more than minimal. Each of these arguments is entitled to and will receive my full consideration. I decline to issue a broad ruling in this case, however, until all parties have had an opportunity to brief the issues in response to the Plaintiffs' Motion for a Preliminary Injunction and/or Summary Judgment On All of Their Claims [Docket 43]. Today, for the reasons stated below, I **GRANT** the motion for a preliminary injunction on the narrow ground that the plaintiffs have established a strong likelihood of proving that Green Valley's "Revision 5" is an illegally segmented project.

### I. Background

The Corps is currently reviewing Green Valley's proposal to dispose of coal refuse, which is known as Incidental Boundary Revision (IBR) 9, under Section 404(a) of the Act. Section 404(a) authorizes the Secretary of the Army, acting through the Corps, to issue individual permits for the "discharge of dredged or fill material into the navigable waters at specified disposal sites." The individual review process under Section 404(a) involves, *inter alia*, "site-specific documentation and analysis, opportunity for public hearing, public in-

terest review, and a formal determination." United States' Memorandum In Opposition To Plaintiffs' Motion For Preliminary Injunction (United States Memorandum) [Docket 49] (citing 33 C.F.R. § 322.3, 33 C.F.R. Parts 323, 325).

While awaiting approval of IBR 9 under the individual review process of Section 404(a), Green Valley applied for approval of a smaller project, known as Revision 5, under NWP 21. On March 25, 2004, the Corps approved the plan for Revision 5, authorizing Green Valley "to place fill material into 431 linear feet (0.044 acre) of an unnamed tributary" of Blue Branch, a tributary of Hominy Creek, near the community of Carl, in Nicholas County, West Virginia. Administrative Record (AR), Vol. I, Tab A, section C. The entire area of land within Revision 5 is also within the proposed boundaries of IBR 9.

NWP 21 was issued pursuant to Section 404(e) of the Act, which authorizes the Secretary, acting through the Corps, to issue general permits involving discharges of dredged or fill material, NWP 21 authorizes "[d]ischarges of dredged or fill material into waters of the U.S. associated with surface coal mining and reclamation operations ..." 67 Fed.Reg.2038, 2081. General permits, as authorized by the Corps pursuant to Section 404(e), are subject to certain "General Conditions." General Condition 19 describes factors that a Corps District Engineer (DE) will consider "when determining the acceptability of appropriate and practicable mitigation necessary to offset adverse effects on the aquatic environment that are more than minimal." 67 Fed.Reg.2020, 2092. In other words, the current regulatory scheme permits the Corps to authorize a project under a general permit, even when the project will have greater than minimal effects on the aquatic environment, so long as the permittee takes adequate steps to mitigate those effects. When NWP 21 was reissued on January 15, 2002, the Corps "proposed to add clarification to NWP 21 that the Corps will require mitigation when evaluating surface mining activities in accordance with General Condition 19." [1]

On April 5, 2004, the plaintiffs moved for a temporary restraining order and/or preliminary injunction, in part asking the court to order the Corps to suspend or revoke its authorization to Green Valley.[2] The parties have stipulated to OVEC's standing to bring an action against the Corps based on the Corps' approval of Green Valley's Revision 5. April 12 Hearing Tr. at 8. OVEC also sought to prevent the Corps from authorizing the filling of more than 300 feet of any perennial stream in this District pursuant to NWP 21. I denied without prejudice that aspect of OVEC's motion. April 6, 2004 Order [Docket 39].

## II. Standard of Review

A district court undertakes a "balance-of-hardship" test when considering a party's motion for injunctive relief. *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 194–95 (4th Cir.1977). The court considers the following four fac-

---

1. The legality of allowing mitigation in the context of NWP 21 projects is a central question in this case, and was considered by the Corps when reissuing NWP 21: "Many of those commenters objecting to the reissuance of NWP 21 stated that the mitigation, even with Corps review and approval, could not sufficiently compensate for these impacts and therefore this NWP would be a violation of

the Clean Water Act requirements that general permits result in only minimal adverse impacts to the aquatic environment." 67 Fed. Reg. at 2042. As stated above, I decline to rule on the issue at this time.

2. For the rest of this opinion, I will refer to all plaintiffs as OVEC, for Ohio Valley Environmental Coalition.

tors: "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir.1991). The court's comparison of the likelihood of harm to each party is its most important consideration. *Id.* The balancing of harms determines the degree to which a plaintiff must demonstrate a likelihood of success on the merits. *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir.1997). If the balance of harms "tips decidedly in favor of the plaintiff, a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Direx Israel*, 952 F.2d at 812 (internal quotations omitted). As the balance of harms tips away from the plaintiff, the plaintiff must make a stronger showing of probable success on the merits. *Id.* Here, OVEC's claims are brought under the Administrative Procedure Act, which states that the actions of a federal agency may be overturned only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). I must consider OVEC's likelihood of success on the merits in the light of that high standard. Only after I have "balanced the hardships, determined the required showing of likelihood of success on the merits and analyzed that likelihood" will I analyze the final factor, the public interest. *Manning*, 119 F.3d at 264.

### III. Analysis

#### A. The Balance of Harms

With regard to Revision 5, OVEC argues that the balance of harms tips decid-edly in its favor, quoting the United States Supreme Court: "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." OVEC Memorandum at 8 (quoting *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)). The unnamed stream here will be permanently filled, an action that will allegedly harm OVEC's members irreparably. *Id.*

■ Green Valley has responded that OVEC has not established a risk of irreparable harm, and that "the so-called stream channel at issue was itself the product of the disturbance about which OVEC now complains." Green Valley Coal Company's Opposition to Ohio River Valley Environmental Coalition, Inc.'s Request To Enjoin Its Corps of Engineers' Authorization (Green Valley Memorandum) [Docket 54] at 8. Green Valley emphasizes throughout its brief that the unnamed tributary at issue here is a "ditch" that resulted from prior mining activities, rather than a natural stream channel. *Id.* at 1, 6, 8, 32. The Fourth Circuit held in *United States v. Deaton*, 332 F.3d 698, 710–11 (4th Cir. 2003), however, that the Corps' jurisdiction under the Clean Water Act extends to ditches, where the ditches are "branch[es] of a tributary system that eventually flows into a navigable body of water." I am not persuaded that the ditch here is worthy of less protection under the Clean Water Act than a natural stream merely because it resulted from prior mining in the area.

With regard to the harm posed to the defendants, Green Valley forecasts that it

will run out of room to store coal refuse in a matter of weeks, and that an injunction will force Green Valley to shut its preparation plant and two deep mines, displacing 130–150 jobs and costing Green Valley or its customers $750,000 per month that cannot be recouped.[3] Green Valley Memorandum at 9. Further, the company will be unable "to provide specialized metallurgical coal to customers such as Elkem Metals Company in a tight metallurgical coal market or a specialized industrial coal to Calgon, which relies exclusively on Sewell seam coal for activated charcoal used to produce military and industrial gas masks." Green Valley Memorandum at 8–9. At the April 22 hearing, Mark Nau of Elkem Metals Company testified as to the ripple effect an injunction will have on Elkem and on the businesses to which Elkem supplies silicon products.

The United States argues that Congress intended to permit some destruction of water when it enacted Section 404 of the Clean Water Act, so that OVEC cannot base its claim to irreparable injury on the fact that Green Valley will destroy a stream. United States Memorandum at 16. Further, the United States argues that mitigation plans under NWP 21 offset impacts to waters of the United States, and "any harm that may result from the activity is adequately compensated and not irreparable." Id. at 16.

 Weighing the likelihood of harm to each of the parties, I **FIND** that the balance tips slightly in favor of the plaintiffs. Once the ditch is filled, it will be gone, and a significant portion of Blue Branch will have been diverted from its current course. It is true, however, that the Clean Water Act anticipates and authorizes the

discharge of pollutants into streams, and that the purpose of NWP 21 is to authorize the filling of streams with materials from surface coal mining. Further, I am not dismissive of the potentially significant costs to Green Valley of an injunction. I would not, therefore, issue an injunction upon a mere showing by OVEC of "questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation," Direx Israel, 952 F.2d at 812, but OVEC has made a stronger showing than that. For the reasons stated below, I **GRANT** the motion for an injunction because OVEC has made a very strong showing that it will succeed in proving that Revision 5 is an illegal segmentation of IBR 9 and thus an abuse of NWP 21.

## B. The Likelihood That OVEC Will Succeed on the Merits

After extensive briefing and a great deal of oral argument devoted to the narrow question of whether the Corps' action in approving Revision 5 was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," I have concluded that OVEC will very likely prevail on its claim that Revision 5 is an illegal segmentation of IBR 9. Revision 5, as authorized by the Corps, calls for Green Valley to divert a portion of Blue Branch onto the Sewell seam bench. The mitigation plan, to which Green Valley is bound, would be senseless in the context of Revision 5 alone. Once completed, however, it will almost certainly have a direct influence on the Corps' decision to authorize IBR 9. For these reasons, I **FIND** that OVEC has established a sufficient likeli-

---

**3.** As stated above, NWP 21 authorizes "[d]ischarges of dredged or fill material ... associated with surface coal mining and reclamation operations ..." Decision Document for NWP 21. If Revision 5 in fact authorizes the dumping of deep mine refuse, it would appear to violate the provisions of NWP 21. That issue is not before me today.

hood of success on the merits to support the issuance of a preliminary injunction.

### 1. Green Valley Submitted the Same Mitigation Plan for IBR 9 and Revision 5.

The Corps requires mitigation when evaluating surface mining activities. As part of its NWP 21 application for Revision 5, therefore, Green Valley submitted a mitigation plan. Determining the exact contours of that plan has proven difficult. At both hearings on this motion, I have solicited explanations of what appears to be a serious discrepancy in the Administrative Record. In its Statement of Findings on Green Valley's Revision 5 application, in a letter signed by Teresa Spagna and Ginger Mullins, the Huntington District's Regulatory Branch Chief, the Corps concluded:

> Based on my review of the above, including the submitted material, drawings and state approvals, I conclude the proposed project will have no more than minimal environmental impacts considered individually and cumulatively on the aquatic environment and the discharges comply with the terms and conditions of the Nationwide Permit (NWP) 21. Therefore, the project will be authorized under the NWP 21.
>
> In view of the above, the project is authorized subject to compliance with the above-mentioned special conditions under Section p. of this document and provided an individual water quality certification is obtained from the State of West Virginia.

AR, Vol. 2, Tab E at 17. The extensive and particularized "special conditions under Section p," with which Green Valley was ordered to comply, begin at the top of page 12 of the Statement of Findings and continue to the top of page 17. Those five

pages actually provide the details of a single, overarching special condition:

> A final compensatory mitigation plan must be submitted to this office for review within 120–days from the date of this verification letter to compensate for the permanent impacts to waters of the U.S. as a result of the mining operation. The revised plan must incorporate the stipulations described below in order to be consistent with requirements outlined in the Corps' regulatory guidance letter dated December 24, 2002.

*Id.* at 12.

I questioned the propriety of the Corps' conclusion that Revision 5 will have no more than minimal environmental impacts, considering its simultaneous request for significant information regarding the mitigation plan. Counsel for Green Valley initially represented that the Statement of Reasons was "a boilerplate document appended to the ... approval of the preconstruction notification." April 12 Hearing Tr. at 44. In its supplemental brief, the United States argued:

> Because the mitigation plan was not complete in all respects, the verification decision allowed the proponent a period of 120 days to submit the required information in a format acceptable to the Corps. It was not necessary, however, for the Corps to condition the commencement of the project upon the receipt of the additional information requested, because the mitigation plan submitted for the Green Valley (Revision 5) project was a sufficiently detailed plan.

United States Supplement at 14–15. The United States has since elaborated, stating that when reviewing the mitigation plan, the Corps had sufficient information before it to issue the NWP 21 authorization. The Corps merely wanted Green Valley to provide the information in a different format.

See, e.g., April 22 Hearing Tr. at 53 ("What the Corps wanted, this is their way of having the applicants do the work, for organizing the material in the way the Corps wants it ..."); id. at 61 ("But I think the important thing is that the Corps had the information available to it that it considered to determine this mitigation plan was appropriate. It just needed to get it all pulled together ..."). For further clarification, counsel for the United States submitted the Declaration of Ginger Mullins. Ms. Mullins states:

> [Green Valley]'s compensatory mitigation plan was contained in numerous sections of the pre-construction notification (PCN). AR Tab A, sections C, E, F, H and K. The PCN contained the majority of the information requested in the special conditions and the Corps determined the information was sufficient to allow the proposed project to proceed in waters of the United States.

Declaration of Ginger Mullins at ¶ 19.[4]

The conclusion I must draw from the United States' evidence and my own review of the Administrative Record is that the mitigation plan Green Valley submitted in connection with Revision 5 was the same plan that it had previously submitted in connection with IBR 9. Green Valley's application for Revision 5 relied almost exclusively on documents originally prepared in connection with IBR 9. See, e.g., AR, Vol. 1, Tab A, Sections E, F, G, H, I, K, M. For example, one document submitted with the Revision 5 application is an impact assessment study that was conducted "to evaluate potential impacts from [IBR 9] on the water quality, fish and wildlife, aquatic habitat, parks, recreation, in-stream and downstream water uses." AR, Vol. 1, Tab A, Section H at i. The impact assessment study describes in some detail the plan to mitigate some of the effects of IBR 9 by relocating Blue Branch: "As proposed in Blue Branch Refuse Facility IBR–9, Blue Branch would be relocated to the Sewell seam bench on the western slope of the valley .... [Green Valley] proposes using this bench to relocate and restore this headwater stream using modern stream restoration techniques." Id. at 18–19. Other documents, like the Benthic Macroinvertebrate Survey (Section E) and the Probable Hydrologic Consequences (Section I), were also initially prepared in connection with IBR 9 and explicitly reference the relocation of Blue Branch. In other words, the Corps concluded that Revision 5 would have no more than minimal impact on the environment after reviewing documents that contemplated the diversion of Blue Branch along the Sewell seam bench.

Ms. Mullins acknowledged, in a series of letters she signed on December 4, 2003, that the plan to mitigate Revision 5 was also the plan to mitigate IBR 9. Writing to officials at the U.S. Environmental Protection Agency, the U.S. Fish and Wildlife Service, West Virginia Department of Natural Resources, West Virginia Division of Culture and History, and WVDEP–Mining and Reclamation, Ms. Mullins stated: "The proposed impacts [of Revision 5] would be

---

4. The United States has filed another supplemental memorandum to help me assess Ms. Mullins's declaration claim. That filing makes clear that some of the required information was missing from the Administrative Record. Among the requests not satisfied by the Administrative Record were, for example: "Indicate all measures that would be used to properly control erosion and sedimentation on the site during mitigation site construction"; "Indicate specific alternative mitigation locations that may be used in the event that mitigation cannot be successfully achieved at the intended mitigation site."; and "The plan should provide information concerning how the stream and the 50–foot riparian zone in a mitigation project will be permanently protected in their natural state in perpetuity."

mitigated via the compensatory mitigation plan submitted with the PCN for the IBR 9 .... Please reference the PCN submission for the IBR 9 previously forwarded to your office for review for details regarding the compensatory mitigation plan." AR, Vol. 2, Tabs R, S, T, U, and V.

### 2. Green Valley Must Comply With the Mitigation Plan That the Corps Approved.

Despite having acquired its permit for Revision 5 in connection with the mitigation plan for IBR 9, Green Valley has suggested that it may not actually divert Blue Branch as contemplated in that plan. As stated by counsel for Green Valley: "If an individual permit is not issued for area 9, there is little reason to go ahead and keep Blue Branch on the bench. We would not propose to do that. We would propose-the plan says we can do that, but there's no reason that we would do that if Blue Branch was not going to be filled." April 12 Hearing Tr. at 30. Counsel for Green Valley also suggested that I could authorize a deviation from the mitigation plan as it was approved by the Corps: "That is, if the Court were inclined to say, 'Well, no, no, that really isn't the standalone mitigation plan,' that could easily be fixed by saying, 'Well, just submit the plan for this section and that will give you enough credit for the 431 feet.' " *Id.* at 31.

The United States has argued that Green Valley is obligated to complete the plan regardless of whether the Corps approves IBR 9:

Significantly, the mitigation plan submitted in support of the application for an individual permit for Revision No. 9 is much more comprehensive than would be required for Revision No. 5, yet the applicant chose to rely upon that plan, and the Corps' verification of the Revision No. 5 project under NWP 21 thus obligates Green Valley to comply with the plan, even if the permit for Revision No. 9 is not granted.

United States Memorandum at 26–27. To the same effect, counsel for the United States explained at the April 12 hearing:

The actual authorization in this case does require the mitigation. It was proposed and the Corps is not going to say, "No, this isn't minimal. You don't have to do any mitigation." The Corps approved the authorization under NWP with the mitigation plan. So, that is a requirement of this particular site authorization.

April 12 Hearing Tr. at 36. At the April 22 hearing, counsel for Green Valley backed away from his earlier statements: "I probably would concede the Corps should make a supplemental finding that the mitigation of the 1200 feet plus what's proposed on the lower ends without damming up the stream is sufficient." April 22 Hearing Tr. at 50. I find that the authorization requires Green Valley to comply with the mitigation plan that accompanied its permit application for Revision 5.

### 3. Revision 5 and the Plan To Mitigate Its Effects By Diverting Blue Branch Constitute an Illegal Segmentation of IBR 9.

In its initial memorandum, OVEC took the position that the mitigation plan "assumes that the much longer Revision 9 refuse fill will be constructed," because "[i]t is physically impossible to create a new 6,000–foot stream along Revision 5's 431–foot refuse fill." OVEC Memorandum at 5. It has since become clear to me, and OVEC has conceded, that Green Valley could literally accomplish the diversion of approximately 8,000 feet of Blue Branch along approximately 6,000 feet of the Sewell seam bench regardless of whether the

area encompassed by IBR 9 actually becomes a refuse fill.

On its face, the plan to "mitigate" the destruction of 431 feet of a stream's small tributary by diverting 8,000 feet of the stream itself is ridiculous. The plan to mitigate so little damage with so much disruption to the watershed is as absurd as the statement by the officer in Vietnam that he had to "destroy the village to save it." As stated by counsel for Green Valley: "It wouldn't make a great deal of sense to do the whole mitigation plan if one didn't get the IP." April 12 Hearing Tr. at 31. If even Green Valley agrees that it would not make sense to complete the mitigation plan upon which the Corps' authorization is based, why did Green Valley submit that plan in the first place? The answer is clear. Green Valley did not develop an independent mitigation plan for Revision 5 because it expects the Corps to approve IBR 9. Green Valley expects to divert Blue Branch one way or the other. The problem with Green Valley's approach is that the diversion of Blue Branch, ostensibly done in mitigation of Revision 5, will influence the Corps' decision to grant IBR 9. Revision 5 is therefore an abuse of NWP 21.

There is no dispute that Revision 5 is a segment of IBR 9. Green Valley applied for Revision 5 to give it space to continue disposing of coal refuse while awaiting approval of IBR 9. *See, e.g.,* AR, Vol. 1, Tab A ("Essentially, this application has been created to allow Green Valley Coal Company to continue to dispose of coal refuse while minimizing impacts to the waters of the U.S. during the review process of the IBR No. 9 application"). The Corps may allow a Section 404(a) applicant to submit a smaller portion of its project for review under NWP 21, subject to certain conditions:

Combining nationwide permits with individual permits. Subject to the following qualifications, portions of a larger project may proceed under the authority of the NWPs while the DE evaluates an individual permit application for other portions of the same project, but only if the portions of the project qualifying for NWP authorization would have independent utility and are able to function or meet their purpose independent of the total project. When the functioning or usefulness of a portion of the total project qualifying for an NWP is dependent on the remainder of the project, such that its construction and use would not be fully justified even if the Corps were to deny the individual permit, the NWP does not apply and all portions of the project must be evaluated as part of the individual permit process.

33 C.F.R. § 330.6(d).

Green Valley and the United States argue that Revision 5 has independent utility. By itself, as a means of providing space for Green Valley to continue disposing of coal refuse in the short term, that may be true. The plan to mitigate Revision 5, however, would clearly not be justified if the Corps were to deny IBR 9. I **FIND** that the only rationale for diverting 8,000 feet of Blue Branch to "mitigate" the destruction of 431 feet of a ditch is to clear the way for the approval of IBR 9.

In *Maryland Conservation Council, Inc. v. Gilchrist,* 808 F.2d 1039 (4th Cir.1986), the Fourth Circuit considered whether the plaintiff had stated a claim for illegal segmentation under the National Environmental Policy Act (NEPA). In that case, county officials had required private developers to develop a proposed highway in segments on either side of a state park. *Id.* at 1041. The development of segments entering and leaving the park, the plaintiffs argued, would influence federal deci-

sions on whether to approve construction of the highway on the proposed segment running through the state park. *Id.* The Fourth Circuit found that the developed segments would "stand like gun barrels pointing into the heartland of the park." *Id.* at 1042 (quoting *San Antonio Conservation Soc'y v. Texas Highway Dep't*, 400 U.S. 968, 971, 91 S.Ct. 368, 27 L.Ed.2d 388 (1970) (Black, J., dissenting from denial of certiorari)). According to the Fourth Circuit, "[t]he decision of the Secretary of the Interior to approve the project, and the decision of any other Secretary whose authority may extend to the project, would inevitably be influenced if the County were allowed to construct major segments of the highway before issuance of a final EIS." *Id.; see also Bragg v. Robertson*, 54 F.Supp.2d 635, 649 (S.D.W.Va.1999) ("the Court considers whether the completion of the first component has 'a direct and substantial probability of influencing' the agency's decision") (quoting *State of North Carolina v. City of Virginia Beach*, 951 F.2d 596, 603 (4th Cir.1991)). In *Virginia Beach*, the defendant sought to build a pipeline from a manmade lake to Virginia Beach, Virginia. 951 F.2d at 603. The Fourth Circuit considered whether construction of part of the pipeline would influence the decision by the Federal Energy Regulatory Commission (FERC) on whether to approve the entire project. Although the Fourth Circuit held that FERC would not be unduly influenced by the situation presented, it nevertheless held that, "there may come a point where the construction and concomitant expenditure of funds would create so much pressure that the completed portions of the pipeline would 'stand like [a] gun barrel[ ]' aimed at FERC." *Id.* at 602 (quoting *Gilchrist*).

Administrative agencies can withstand a great deal of pressure. The Fourth Circuit noted that, "[a]t some point, the pressure reduces to the level of background noise in the decision-making process." *Id.* at 603. What Revision 5 accomplishes, however, is the trivialization of the Corps' decision on IBR 9. Once Blue Branch is diverted, Green Valley will have overcome the most significant obstacle in its path to filling IBR 9 with coal refuse. Rather than unduly pressuring the Corps, Revision 5 will have made its decision on IBR 9 largely an afterthought.

The United States argues that Revision 5 is not illegally segmented from IBR 9 because Corps regulations provide: "Where a portion of a larger project is authorized to proceed under an NWP, it is with the understanding that its construction will in no way prejudice the decision on the individual permit for the rest of the project." United States Memorandum at 26 (quoting 33 C.F.R. § 330.6(d)(1)). In other words, the Corps argues that it must follow its own regulation and not allow itself to consider Revision 5 (and its mitigation plan) when deciding whether to authorize IBR 9. Or, put yet another way, the Corps will not consider the fact that Blue Branch no longer runs through IBR 9 when deciding whether to allow Green Valley to dispose of coal refuse there. It would defy common sense to urge a proposition that the Corps would not be influenced in issuing a permit under the Clean Water Act by the fact that the stream which is to be filled under IBR 9 has already been moved and in fact no longer exists. I am of the opinion that where a mitigation plan for a smaller, NWP-approved project is more extensive than necessary and operates to make approval of the larger, individually-reviewed project nearly certain, there has been an illegal segmentation under *Gilchrist* and *Bragg*.

The mitigation plan diverts an enormous amount of water away from the area encompassed by IBR 9. That is, the 8,000 feet of Blue Branch currently flowing

 

through IBR 9 will be moved. The Corps will be left to determine, when considering IBR 9, whether to permit Green Valley to fill the bed of a stream that has already been moved. Revision 5 will achieve, in the guise of mitigation, one of the primary goals of IBR 9, making the Corps' determination on the IBR 9 permit an exercise in evaluating the filling of a virtually empty stream bed. The diversion of Blue Branch will then have directly and substantially influenced the Corps' decision on IBR 9. While the nature of this motion requires me to reserve final judgment at this time, I **FIND**, without difficulty, that OVEC has made a strong showing that Revision 5 is. an illegal segmentation and an abuse of NWP 21, and thus of likelihood of success on the merits.

### C. The Public Interest

Having weighed the harm to the parties and OVEC's likelihood of success on the merits, I must consider the public interest. OVEC argues that, by enacting Section 404, Congress "decided that the public interest favors the use of NWPs only when it involves the 'minimal' filling of streams." OVEC Memorandum at 19. Because this case raises questions as to whether Revision 5 will have minimal impact on the environment, OVEC argues that injunctive relief is in the public interest. *Id.* In response, the United States argues that "[t]he public interest militates in favor of allowing the Corps to perform its statutory duties under the CWA while the Court reviews the manner in which the Corps has carried out its role." United States Response at 17.

I **FIND** that the public interest weighs in favor of OVEC. The public has an interest in the integrity of the waters of the United States, and in seeing that administrative agencies act within their statutory authorizations and abide by their own reg-

ulations. OVEC has made a strong showing that the Corps' approval of Revision 5 was arbitrary and capricious and contrary to law.

### IV. Conclusion

For the reasons stated above, I **GRANT** OVEC's motion in part and **PRELIMINARILY ENJOIN** the Corps from authorizing Green Valley to proceed with Revision 5 under NWP 21.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party, and **DIRECTS** the Clerk to post this published opinion at http://www.wvsd.uscourts.gov.